# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-1157

OMEGA HEALTHCARE INVESTORS, INC.,

*Plaintiff-Appellant,*

*v.*

RES-CARE, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 99 C 862—**Richard L. Young**, *Judge.*

---

ARGUED SEPTEMBER 7, 2006—DECIDED JANUARY 22, 2007

---

Before RIPPLE, KANNE, and WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* This diversity case concerns the lease and administration of a residential healthcare facility in Lexington, Kentucky.[1] The appellant, Omega Healthcare Investors, brought suit against Res-Care alleging, among other things, breach of contract. The parties filed cross-motions for summary judgment, and the

---

[1] Because seven of the eight facilities that were the subject of the original complaint were located in Indiana, venue in the Southern District of Indiana was proper. By the time it reached this court, the only remaining issue of contention concerned a single facility in Lexington.

district court granted summary judgment in favor of Res-Care. Omega appeals. For the reasons set forth below, we reverse the judgment of the district court and remand for further proceedings.

## I. HISTORY

In 1989, Omega's predecessor in interest entered into a ten-year lease with Robert E. Petrie for certain property, referred to in the lease as the "Lexington Campus" but referred to by the parties during this litigation as the Excepticon Facility (Excepticon).[2] The property was a healthcare facility designed to house and care for patients with developmental disabilities. In the accepted language of the time, this was referred to as an Intermediate Care Facility for the Mentally Retarded (ICF/MR).

Because Omega, a real estate investment trust, could not operate a medical facility, the lease envisioned that Omega would rent the facility to Petrie and that Petrie would acquire the necessary licenses to run the facility. However the actual day-to-day management of Excepticon was to be performed by a third party—Res-Care. To that end, Petrie and Res-Care simultaneously entered a second contract, referred to as the Management Agreement. The Lease (between Omega and Petrie) and the

---

[2] The parties to the original lease were Angell Real Estate Company and Robert Petrie. The parties to the accompanying Management Agreement were Petrie and Res-Care Health Services, Inc. Omega is Angell's successor in interest, and Res-Care is Res-Care Health Services' successor in interest. For clarity, except where necessary, we will refer to "Omega" and "Res-Care" uniformly even where actions were actually taken by Omega's predecessor in interest or Res-Care's predecessor in interest.

Management Agreement (between Petrie and Res-Care) each make reference to the other document.

For about eight years, the three parties happily coexisted, Omega as the lessor of the property, Petrie as the lessee of the property, and Res-Care managing the property. But in 1998 the environment began to change when Res-Care purchased all of the Petrie rights and obligations under the Management Agreement and the Lease from the Petrie estate. At this point there were only two parties—Omega owned the property and leased it to Res-Care, who became both the lessee and also the day-to-day manager of operations in the facility.

Over the course of 1998 and 1999, Res-Care began a process of working with the Commonwealth of Kentucky to move the patients out of the Excepticon Facility and into non-institutional community-based care. However, Kentucky would not be able to pay Res-Care to manage the community-based treatment for the former residents of Excepticon as long as Excepticon was still open and certified to provide care for the developmentally disabled patients. By shutting the doors to Excepticon, Kentucky would be able to apply for federal funding for the residents to move into community care under a program called a conversion waiver, a waiver that would not be available if Excepticon was still operating.

Res-Care then did the following three things: it sought and received an order from the district court to prevent Omega from reclaiming possession of the property at the natural termination of the Petrie lease; it helped the residents of Excepticon move into community-based care arranged by Res-Care; and (once the patients were removed) it closed the ICF/MR. With those preconditions met, Kentucky was able to rescind its certificate of need for an ICF/MR, and federal funding for community-based care was approved. When Omega regained possession of

Excepticon from Res-Care, it had no patients, no employees, and was no longer certified for use as an ICF/MR in Kentucky.

Omega brought suit. Over Res-Care's objection, the district court gave Omega leave to file a Third Amended Complaint on July 31, 2002. This complaint contained five counts. During the Spring and Summer of 2003, the parties filed cross-motions for summary judgment. Omega moved for summary judgment on Counts I and V. Res-Care moved for summary judgment on Counts I, II, IV, and V. On December 4, 2003, the district court entered judgment granting Res-Care's motion for summary judgment on Count V and denying Omega's motion for the same.[3]

For two more years, the parties argued about the remaining four counts. By December 27, 2005, the parties had reached a settlement agreement on those four counts, and the district court entered an order dismissing all remaining claims and making the 2003 judgment on Count V a final and appealable order. Omega appeals the order granting summary judgment to Res-Care on Count V.

---

[3] The appellant argues that the district court's order should, in fact, be read as a dismissal for failure to state a claim under FED. R. CIV. P. 12(b)(6). To that end, Omega has filed a new lawsuit in the district court with an eye toward more specifically pleading breach of contract. It is true that the court did use the term "dismissed" in resolving the claim and relied almost exclusively on the content of the plaintiff's complaint. But the court also looked to one affidavit and to the briefs of the parties. Because the parties and the court made reference to materials outside the pleadings, Rule 12 would have required that the motion be considered under Rule 56 anyway, which we will do. FED. R. CIV. P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . .").

There is no disagreement that Excepticon was very nearly fully-staffed and fully-occupied when Res-Care assumed the obligations of the lessee in 1998. By the time Res-Care returned the premises to Omega at the end of 1999, the facility was empty. At the heart of this dispute is a disagreement about whether Res-Care owed any duty to run Excepticon in a particular manner during the years 1998 and 1999, and if so whether it breached those obligations. Because the complaint and Omega's motion for summary judgment alleged that Res-Care's behavior violated both the Lease agreement and the Management Agreement, we will consider them separately. At some points the consideration of one necessarily implies consideration of the other.

## II. ANALYSIS

We review an appeal of summary judgment *de novo*. *Lee v. Keith*, 463 F.3d 763, 767 (7th Cir. 2006). On summary judgment, a party is entitled to judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). We view all facts and draw all inferences in the light most favorable to the non-moving party. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006).

In its motion for summary judgment, Omega clarified exactly how it believes that Res-Care breached its two contracts. It alleged that many of the acts that Res-Care took in conjunction with the Commonwealth of Kentucky in 1998 and 1999 constituted breaches of the Management Agreement that was originally signed by Res-Care and Petrie. Omega also alleged that those same actions violated paragraph 23 of the Lease. It further alleged

that Res-Care had breached paragraphs 9 and 36 of the Lease, independent of any breach of the Management Agreement. Finally, Omega noted that under the Lease, if the court believed that the Management Agreement had been terminated that such termination was a further violation of Lease paragraph 25.

For reasons that are unclear, Res-Care has contended for several years now that the Third Amended Complaint only alleged a breach of the Management Agreement, and said nothing about the Lease. There is simply no way that this argument can be squared with the plain language of the complaint. For example, paragraph 105 of the complaint reads, in its entirety: "Res-Care refused to surrender control and operation of the Lexington facility at the termination of the Lease, and continued to operate the facility in violation of the lease surrender provisions from the termination of the Lease through December 31, 1999." Likewise, paragraph 106 reads: "Defendant's conduct in refusing to surrender the leased facility at the termination of the Petrie Lease Agreement constituted a breach of that written contract." Paragraph 107 reads: "Defendant's conduct . . . constituted multiple breaches of the Petrie Lease and the Defendant's Guaranteed Management Agreement." How it could be possible to read these three paragraphs as dealing exclusively with the Management Agreement defies explanation.

A federal complaint requires only a short and plain statement of the claim. FED. R. CIV. P. 8(a). A plaintiff in federal court "need do no more than narrate a grievance simply and directly, so that the defendant knows what he has been accused of." *Doe v. Smith,* 429 F.3d 706, 708 (7th Cir. 2005). This defendant was on notice that Count V pleaded not only a breach of the Management Agreement but also of the Lease agreement. Repeatedly denying this fact does not change reality. Res-Care is entitled to take issue with questions of fact and law as presented

by Omega in its motion, but Res-Care is not entitled to pretend, *ipse dixit*, that entire portions of the complaint and entire pages of the plaintiff's memorandum supporting its motion for summary judgment simply do not exist. We will consider each alleged breach of the two contracts in turn.

*A. Breach of the Management Agreement Itself*

The terms of the Management Agreement that Omega believes were breached can be summarized as follows: the contract required that the manager of the property would "maintain and operate the facility in compliance with the standards for state licensure . . . sufficient to maintain a license as an ICF/MR facility" and "not do or permit to be done any act or thing which . . . is incompatible with its operation as an ICF/MR facility." Management Agreement § II(d), § II(h). Additionally, it was a "goal" that the manager "seek to maintain appropriate and adequate relationships with referral sources sufficient to maintain 99% occupancy." Before considering the evidence to support these allegations, we must (as did the district court) consider Res-Care's legal argument that the Management Agreement had ceased to exist when Res-Care bought out Petrie and became both the lessee and the manager. We agree that the Management Agreement ceased to exist on January 1, 1998.

The Management Agreement on its face is a contract between Petrie and Res-Care. The first question faced by the district court and by this court is whether Res-Care's acquisition of Petrie's rights and obligations under the Management Agreement made that agreement void. We conclude that it did.

The principle involved here was summarized in the Restatement of Contracts § 451: "Where a person subject

to a contractual duty, or to a duty to make compensation, acquires the correlative right in the same capacity in which he owes the duty, the duty is discharged." The comments and examples clarify. "A legal duty cannot be owed by a person to himself acting in the same capacity." RESTATEMENT (FIRST) OF CONTRACTS § 451 cmt. a (1932). "A owes B $100. A is B's next of kin, and B dying without a will A inherits all of B's property. A's duty to B is discharged." RESTATEMENT (FIRST) OF CONTRACTS § 451 ill. 1 (1932).

Although the Kentucky case law on the topic is scant, it supports the view that Kentucky follows the Restatement. Res-Care cites to *Allin v. Shadburne*, 31 Ky. (1 Dana) 68 (Ky. 1833), for the long-standing proposition[4] that a party cannot contract with itself. Although that case had not been mentioned in the courts of Kentucky since 1904, *see United Loan & Deposit Bank v. Bitzer*, 78 S.W. 183, 184 (Ky. 1904), we can find no authority to suggest that this does not remain the law of contract in the Commonwealth of Kentucky. We agree that under Kentucky contract law the Management Agreement was nullified when Res-Care bought Petrie's interest in 1998 and therefore could not have been breached.

Omega makes two counter-arguments on appeal. Omega claims that it was an intended third-party beneficiary to that contract and that the two contracts were actually a single three-party contract and therefore Res-Care is not the only party on both sides of the Management Agreement. Because Omega did not raise either of these arguments in the district court they have been forfeited for

---

[4] We recognize that "long-standing proposition" is a party's shorthand for being unable to find an authority more recent than the 19th century. Nevertheless, it appears to remain good law.

the purposes of this appeal. *Coker v. Trans World Airlines, Inc.,* 165 F.3d 579, 586 (7th Cir. 1999).

*B. Breach of Paragraph 23 of the Lease*

Omega argued in the district court and properly preserved for appeal its contention that the *terms* of the Management Agreement were also incorporated into the Lease. *See* Pl. Mem. Supp. Summ. J. 2 ("However, the Lease Agreement made clear that the terms and provisions of the Management Agreement were a part of the Lease with Omega, and the breach of any of those terms and provisions would constitute a breach of the Lease."). We agree with Omega.

Under Kentucky law, a contract can incorporate terms by reference to outside sources. *Bartelt Aviation, Inc. v. Dry Lake Coal Co.,* 682 S.W.2d 796, 797 (Ky. Ct. App. 1985) ("[W]hen a signature is placed after clear language has expressed the incorporation of other terms and conditions by reference, it is a logical inference that the signer agrees to be bound by everything incorporated.").

Paragraph 23 of the Lease reads, "Lessor approves the entry by Lessee simultaneously with the execution of this Lease, into a Management Agreement (herein the "Management Agreement") of even date . . . a true and correct copy of which is attached hereto as Exhibit C_ and *made a part hereof*. Lessee agrees that it will not consent to any modification or amendment of the management agreement without the prior written approval of the Lessor." Lease ¶ 23 (emphasis added). Omega argues that this paragraph was sufficient to incorporate the Management Agreement into the Lease.

Paragraph 23 of the Lease is unambiguous, and the interpretation of unambiguous contract provisions is a question of law. *First Bank & Trust v. Firstar Info. Servs.*

*Corp.*, 276 F.3d 317, 322 (7th Cir. 2001). The only sensible way to interpret paragraph 23 is that the parties to the Lease (Omega and Petrie) intended that the specific provisions of the Management Agreement were a part of the basis of their bargain—that operation of the facility in a particular manner was necessary to protect the interests of the parties to the Lease. This view is supported by reading Lease paragraph 23 in conjunction with Lease paragraph 25. *See Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 384-85 (Ky. Ct. App. 2002) ("Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible.") (internal citation and quotations omitted). Not only was any change to the facility's management subject to Omega's approval, any lapse of the Management Agreement constituted breach of the Lease by Petrie. We are convinced that the terms of the Lease are clear and that the contract incorporates the provisions of the Management Agreement into the Lease.

Of course Res-Care, in its role as manager of Excepticon, could not be bound by a contract between Omega and Petrie. But on January 1, 1998, Res-Care also became the lessee of the facility, and was bound by the obligations that Petrie had agreed to in the Lease, just as (Res-Care agrees) it assumed Petrie's obligation to pay rent to Omega. As Res-Care acknowledges in its brief, by January 1, 1998, there was no longer a manager of Excepticon: there was only a lessor and lessee. Res-Care, as the lessee, accepted the terms of the Lease.

However, Res-Care submits that Omega consented to the sale of the Petrie assets to Res-Care. Omega's admissions in a separate pleading before a Kentucky administrative agency support the view that Omega consented to the substitution of *parties* to the two contracts, but Res-Care provides nothing to suggest that Omega consented to any alteration of the *terms* under which the facility

would be managed. The lessee of the facility, first Petrie and then Res-Care, agreed to manage the facility in accordance with certain standards. Those were memorialized in the Management Agreement between Petrie and Res-Care, but we conclude that as incorporated terms they were also binding on Petrie as lessee and later Res-Care as lessee under the separate Lease. Whatever effect substituting the parties had on the Management Agreement, there is no indication that the incorporated terms of the Lease were changed thereby.

The only remaining question for this court is whether the legal demise of the Management Agreement prevents the incorporated terms from being effective as part of the separate Lease Agreement. We are forced to look as far back as 1922 in Kentucky to find an answer to that question. In *Torian v. Hibbs*, 245 S.W. 502 (Ky. 1922), the court held that parties to a contract could properly incorporate the terms of a previous expired and unenforceable contract into a different contract. Finding nothing to suggest that this is not the case today, we believe that under Kentucky law the terms of the Management Agreement, not having been modified by the parties to the lease, remained binding on the lessor and lessee despite the legal lapse of the separate Management Agreement.

The facts, even when viewed in the light most favorable to Res-Care, are sufficient to establish that Res-Care breached the terms incorporated into paragraph 23 of the lease.[5] The affidavits and depositions that accompanied Omega's motion for summary judgment established the

---

[5] Res-Care's brief in this court does not address any of the facts that Omega presented as not being in dispute, relying instead on two purely legal arguments: that there was no contractual duty, or alternatively that even if there were any duties owed to Omega that public policy prevented following through on them.

facts that follow. Sometime after Res-Care assumed Petrie's obligations under the lease in 1998, Res-Care approached Kentucky about moving patients from the Excepticon facility into the community. This is corroborated not only by depositions of Kentucky officials but also by admissions of Res-Care's officers. *See* Morse Dep. at 7:1-7:5; Geary Dep. at 73:7-73:25. In fact, Res-Care had drawn up a plan for how it would close Excepticon and convert the certified need for the ICF/MR beds into community-based care for those patients. *See* Kelley Dep. at 80:6-82:19. Kentucky officials informed Res-Care that any funding for community-based care would be conditioned on closing Excepticon. *See* Morse Dep. at 7:13-8:7. Res-Care informed Kentucky that it was in a position to permanently close Excepticon. *See* Boyd Dep. at 9:21-10:19. Although the parties have now quibbled for years over whether "eviction" is the proper description, officials from Kentucky confirm that the residents of Excepticon were not given the choice to remain in Excepticon (even though they eventually left of their own free will, having been informed that the facility was closing). *See* Boyd Dep. at 18:6-18:8, 33:25-34:7. Kentucky informed Res-Care that the process of shifting the patients from Excepticon to the community would result in the revocation of Excepticon's license to continue operating as an ICF/MR. *See* Morse Dep. at 7:13-8:7. Res-Care's general counsel admitted that closing the facility was incompatible with its continued operation as an ICF/MR. *See* Waskey Dep. at 72:8-72:11. At the time that the patients were being moved from Excepticon, there was a waiting list for Medicaid-funded beds in ICF/MRs in Kentucky. *See* Boyd Dep. at 20:6-20:10.

There are no material facts in dispute. Over the course of two years, Res-Care initiated a plan to move the patients from Excepticon into the community. Res-Care approached Kentucky and offered to close Excepticon. As patients were placed into the community, Res-Care did

nothing to bring new patients into the facility off the waiting list. Res-Care knew that its actions were incompatible with Excepticon's continued operation as an ICF/MR and incompatible with Excepticon's continued licensure as an ICF/MR. Res-Care's actions as lessee were in violation of the terms incorporated into the Lease by paragraph 23. Barring success on Res-Care's affirmative defense of a public policy exception (see Part II.F below), Omega is entitled to judgment as a matter of law for breach of the incorporated terms of paragraph 23 of the Lease.

## C. Breach of Paragraph 9 of the Lease

Omega argued in its motion for summary judgment that Res-Care breached Paragraph 9 of the Petrie lease, entitled "Alterations." It reads, in relevant part, that the "[l]essee shall not make any alterations or additions to the Demised Premises without Lessor's prior approval." The definition of the Demised Premises is provided in paragraph 1 as:

> assets, rights, interests and other properties owned by the lessor and relating to the Facility . . . [including] . . . (c) Appurtenances: all tenements, hereditaments, rights, privileges, interests, easements and appurtenances belonging or in any wise pertaining to the Parcel and/or the Improvements . . . .

Omega argues that Res-Care impaired Omega's rights, privileges, and interests during the term of the lease by destroying or impairing the Medicaid certificate of need (CON) for the slots at the Excepticon ICF/MR. Omega argues that those impairments constitute an alteration of the demised premises in violation of paragraph 9.

Because Omega is a real estate investment trust, and not a medical service provider, Res-Care argues that the CON

could not possibly have been among the rights, privileges, or interests that ran as part of the demised property. Res-Care's argument is supported by the fact that the lessees and managers of Excepticon have been the ones who applied for and received the various licenses and CONs throughout the term of this Lease. In fact, it was the operators and managers exclusively who had ever acquired any "right" or "privilege" to operate the facility under a CON. Since this was not part of the premises that Omega's predecessor had demised to Petrie, its absence upon lease termination could not be an alteration of the premises. The CONs and any other right to operate the facility were simply never leased from Omega to Petrie and their absence does not violate paragraph 9 of the Lease.

## D.  Breach of Paragraph 36 of the Lease

Paragraph 36 of the Lease is extensive, occupying more than two single-spaced pages of the original contract. It is entitled "Surrender; Obligations Upon Expiration or Termination." While much of the boilerplate in the paragraph is inconsequential to this case, Omega alleged in its motion for summary judgment that there are four specific clauses in paragraph 36 that Res-Care had breached. Paragraph 36(a) required that the lessee "shall [upon the termination date] well and truly surrender and deliver the Demised Premises into the possession and use of the Lessor without fraud or delay." Paragraph 36(c)(2) required that upon surrendering the premises the lessee must warrant that "[t]here is no outstanding written notice of default, cancellation or termination in connection with any instrument or document which could be construed, directly or indirectly, to bind or in any way affect Lessor or Lessor's assigns after the termination hereof." Paragraph 36(d) required that the lessee shall "use its best efforts to persuade such personnel of the Facilities

as Lessor may designate to become employees of Lessor or Lessor's assigns after the expiration or termination of the term hereof." Finally, paragraph 36(f) required that the lessee must allow the lessor to use the lessee's Medicaid provider number for a short period after surrendering the premises until the lessor acquired its own provider numbers so that it could continue to bill Medicaid during the transition period.

There is no doubt that Res-Care did not initially surrender the demised premises as required by paragraph 36(a). The parties agreed to an order, entered by the district court on October 26, 1999, that allowed Res-Care to remain in possession of the premises until December 31, 1999. Because Omega agreed to allow Res-Care to remain in possession, such possession cannot of itself be grounds for a claim for breach of paragraph 36. KY. REV. STAT. ANN. § 383.160 (West 2006) (permitting the parties to expressly contract for holdover beyond the day that a lease terminates). But the district court's order also put a limit on what Res-Care could do during this holdover period. By agreement of both parties, paragraph 6 of the October 26 order required that "Res-Care shall not use its holdover position to impair Omega's ability to continue to operate Excepticon as a Medicaid funded ICF/MR facility."

Reading paragraph 6 of the agreed order in conjunction with the provisions of paragraph 36 of the Lease, which clearly required Res-Care to deliver the premises in such a condition as to be ready to continue operation as an ICF/MR, we conclude that the actions taken between September 1 and December 31, 1999 constituted a breach of paragraph 36 of the Lease. Res-Care was under an obligation to turn over the premises at the end of August. If it had done so, it would have given Omega a partially occupied and staffed ICF/MR that was still licensed. Admittedly, as we held above, Res-Care was already in breach by August 31. But had Res-Care surrendered the

premises Omega would have been allowed to look for a new operator to take over the management of the facility. Omega and Res-Care negotiated an extension to that lease turnover date on the explicit conditions—which were consistent with the parties' intentions expressed in paragraph 36 of the Lease—that the facility would still be capable of being operated as a Medicaid-funded ICF/MR facility when the eventual turn-over occurred.

The facility that Res-Care surrendered was anything but capable of being used as such. We note that the undisputed facts above that put Res-Care in breach of the incorporated management terms apply equally here. The occupants were gone, the staff was gone, and the Commonwealth was pulling the plug on its certification. Although the parties differ in their characterization of how the residents were moved—Res-Care says they all left of their own will, Omega says they were evicted—the parties agree that Res-Care took affirmative steps to place the residents elsewhere and made no efforts to replace them. The parties also agree that Res-Care had been negotiating with Kentucky before the hold-over period to arrange for community-based care, and that the funding of community-based care (and Res-Care's eventual profits therefrom) would depend on the permanent closure of the Excepticon Facility. It is also clear that both parties are in agreement that it was during this holdover period that the *coup de grâce* was delivered to Excepticon when its last patient left (or was evicted) and the Commonwealth was free to decertify the facility. On the basis of these actions alone, Omega is entitled to summary judgment on the issue of liability for breach of paragraph 36 of the Lease.

## E. Breach of Paragraph 25 of the Lease

Finally, Omega alleged in its motion for summary judgment that any lapse of the Management Agreement

would constitute a separate breach of paragraph 25 of the Lease. Pl. Mot. Supp. Summ. J. 3-4 ("The lease also makes the termination of the Management Agreement a breach of the Lease, for which Res-Care would be liable pursuant to its obligations under the Lease terms."). Omega specifically pointed the court to Lease paragraph 25, entitled "Default, Termination" which reads in relevant part, "The parties hereto agree that notwithstanding any other provision of this Lease, the term 'default' as used in the Lease will also include (i) the termination, either voluntary or involuntary, of the Management Agreement; or (ii) the occurrence of an event of default by either party to the Management Agreement."

Res-Care has based much of its appeal on the (correct) theory that its purchase of the Petrie interests on January 1, 1998, resulted in the termination of the Management Agreement as a standalone contract. But Res-Care did not respond in the district court to Omega's argument that the termination of the Management Agreement would also put it in breach of the Lease. Res-Care's defense to the argument on appeal is to assert (once again) that Omega never made that argument below. Appellee's Br. 32-34. They are incorrect.[6] Having failed to identify any law or facts that would preclude this interpretation of paragraph 25, we find that the lessee (Petrie and Res-Care as his successor) was in default under the terms of the Lease effective January 1, 1998, when the Management Agreement was terminated. The practical effect of this

---

[6] Omega incorporated by reference certain arguments from its brief in *support* of its own motion for summary judgment into its brief in *opposition* to Res-Care's motion. See Pl. Mot. Opp. Summ. J. 20 ("For a detailed description of the Lease terms and provisions and the applicable law, Omega incorporates by reference its Brief in Support of Cross Motion for Summary Judgment, on Count V.").

remains to be seen, as there has been no offering of proof of any damages suffered as a result of that default. Those damages, if there are any, will be among the issues addressed on remand.

### F. Res-Care's Public Policy Defense

Res-Care has placed much reliance on its argument that public policy prevents the enforcement of the terms of the Lease. In Kentucky, it is "a question of law . . . whether [a] contract, if made, can be enforced, or whether it is void as against public policy." *Hickey v. Glass,* 149 S.W.2d 535, 536 (Ky. 1941). We consider questions of law *de novo.* This argument fails because it misinterprets the state of the law with respect to integration of the developmentally disabled and it misrepresents the facts of the current case.

Res-Care's argument is that enforcing the terms of the contract "would effectively prevent people with disabilities from leaving large institutional facilities like Excepticon, contrary to clearly stated federal and state public policies." Appellee's Br. 44-45. This argument relies on *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581 (1999). *Olmstead* stands for the proposition that in order to avoid violating the Americans with Disabilities Act (ADA), the placement of individuals in community-based settings is appropriate "when the state's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 587.

Res-Care's reliance on the integration mandate, as expressed by *Olmstead,* is misplaced. Res-Care overlooks the fact that *Olmstead* requires only that particular

individuals be given the choice of community placement or institutional care. *Olmstead* specifically does not stand for the proposition that ICF/MRs must be closed. The Supreme Court explicitly rejected the argument that Res-Care is now making, that the ADA somehow requires that institutional care be discontinued. "We emphasize that nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." *Id.* at 601-02. Kentucky continued to operate ICF/MRs after *Olmstead.* The depositions that accompanied Omega's motion for summary judgment included assurances from Kentucky officials that there were waiting lists for facilities such as Excepticon and that Kentucky was not in the process of closing other ICF/MRs. *See* Boyd Dep. at 19:16-21:1. Res-Care's CEO admitted during his deposition that the company continued to operate ICF/MRs elsewhere. *See* Geary Dep. at 46:4-47:13. To the extent that there is a public policy on community-based care, it is a mandate that individuals be given choices, not a mandate to force the lessees of institutional facilities to shut the doors of their facilities in violation of lease terms. To suggest that continued operation of Excepticon would be "illegal" was disingenuous at best.

In summary, Robert Petrie, and later Res-Care as his successor, agreed to rent a fully-functional, fully-occupied, and fully-staffed medical facility from Omega. Recognizing that much of the residual value of the facility would depend on its return in substantially the same condition, Omega included certain protections in the lease. Omega required that the facility would be managed in a particular way, specifically requiring that the people who were entrusted with the facility not do anything that would result in its de-certification. The terms of the separate Management Agreement were properly incorporated into the Lease. Any deviation from them, or any termina-

tion of the agreement, constituted a breach of the lease. Any failure to surrender the premises at the end of the lease period constituted a separate breach of the lease. Res-Care, as Petrie's successor in the lease, inherited those obligations. Even viewing the facts in the light most favorable to Res-Care, it is clear that Res-Care breached paragraphs 23, 25, and 36 of the lease. Omega is entitled to judgment as a matter of law, however the question of adequate damages is not properly before this court.

### III. CONCLUSION

Accordingly, for the reasons set forth above, the judgment of the district court is REVERSED and the case is REMANDED with instructions to enter summary judgment in favor of the plaintiff on Count V of the Third Amended Complaint, and for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*