In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3280

PQ CORPORATION,

*Plaintiff-Appellant,*

*v.*

LEXINGTON INSURANCE COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 CV 3482 — **Manish S. Shah**, *Judge.*

ARGUED FEBRUARY 14, 2017 — DECIDED JUNE 27, 2017

Before ROVNER, WILLIAMS, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal presents a dispute over warehouse liability insurance. Defendant Lexington Insurance Company denied a claim by its insured, Double D Warehouse, LLC, for coverage of Double D's liability to customers for contamination of warehoused products. One basis for denial was that Double D failed to document its warehousing transactions with warehouse receipts, storage agree-

ments, or rate quotations, as required by the applicable insurance policies. Litigation ensued. Plaintiff PQ Corporation was a customer of Double D whose products were damaged while warehoused there. PQ is now the assignee of Double D's policy rights, having settled its own case against Double D by stepping into Double D's shoes to try to collect on Lexington's insurance policies. PQ argued in essence that even though Double D had not documented its warehousing transaction in one of the ways specified in the insurance policies, there were pragmatic reasons to excuse strict compliance with those terms. The district court, however, granted summary judgment in favor of Lexington, enforcing the documentation requirement in the policy.

We affirm. PQ has a point when it says that the documentation Double D actually had (bills of lading and an online tracking system) should serve much the same purpose as the documentation required by the policies (especially warehouse receipts). Yet commercially sophisticated parties agreed to unambiguous terms and conditions of insurance. We hold them to those terms. To do otherwise would disrupt the risk allocations that are part and parcel of any contract, but particularly a commercial liability insurance contract. PQ has offered no persuasive reason to depart from the plain language of the policies.

I.  *Factual and Procedural Background*

Double D is an Illinois limited liability company that operates a warehouse facility in Peru, Illinois. Double D maintained liability insurance coverage with defendant Lexington, a Delaware corporation. For approximately ten years, plaintiff PQ, a Pennsylvania corporation, stored two chemical prod-

ucts at Double D's warehouse: a magnesium sulfate compound commonly known as Epsom salts, and a sodium metasilicate sold under the trademark METSO BEADS®. In 2011, PQ began receiving complaints from its own customers about product discoloration. PQ investigated and eventually concluded that the likely culprit was vapors from phenol formaldehyde resin that Double D also stored in its warehouse. The vapors apparently reacted with PQ's highly alkaline products. PQ notified Double D that it intended to hold Double D responsible for any claims made by its customers. Double D then alerted Lexington to the potential claim.

Two annual warehouse legal liability insurance policies are at issue: one effective from June 29, 2010 to June 29, 2011, and the other from June 29, 2011, to June 29, 2012. Both policies provided that Lexington would pay all sums for which Double D became legally obligated "for direct physical 'loss' or damage to personal property of others because of [its] liability as a warehouse operator," subject to several terms and conditions.

The most important condition for our purposes appeared in sections I.1 ("Insuring Agreement") and II.4 ("Property Not Covered"). It said that Lexington would pay for damages only to the extent that Double D produced a warehouse receipt or storage agreement signed by its customer or a rate quotation that it had presented to its customer before storing the property. Another relevant condition appeared in section X.1.F ("Loss Adjustment"), forbidding Double D from assuming any obligation or admitting any liability without Lexington's consent. A third condition, the "Pollution and Contamination Exclusion," barred coverage for any loss caused by the release of pollution, defined broadly as irritants or contaminants

"which after … release can cause or threaten damage to human health … or cause[] or threaten[] damage … to property insured hereunder."

In late 2011, an independent adjuster hired by Lexington informed Double D that he was investigating PQ's claim. The adjuster also contacted counsel for PQ, requesting details and supporting documents. The following June, PQ sent the adjuster a claim letter with documentation. Seven months later, Lexington denied coverage for PQ's claim, citing the Insuring Agreement and Property Not Covered section, as well as the Pollution and Contamination Exclusion. Lexington explained that "neither Double D nor PQ ha[d] provided Lexington with proof of a signed warehouse receipt, storage agreement or rate quotation." Lexington also said that because PQ had reported damage to its products caused by chemical vapors, the Pollution and Contamination Exclusion barred any coverage. Lexington reiterated its denial of coverage in an April 2013 letter. Both denial letters included a vague invitation: "Should you have any other information you feel may be applicable or relevant to this matter, please immediately forward it to [Lexington]. Please be advised that Lexington will review any additional information submitted under a full reservation of rights under the Policy and at law … ."

Following Lexington's denial of coverage, Double D sued Lexington in an Illinois state court alleging breach of contract and seeking a declaration as to its rights under the policies. Lexington removed the action to federal court. (Diversity of citizenship is complete with both Double D and PQ as plaintiffs and Lexington as defendant, and the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332(a).) Shortly after the removal, PQ sued Double D in state court. PQ and Double

D settled. The key term of the settlement was that Double D agreed to a consent judgment under which it assumed "one hundred percent … of the fault for PQ's damages" and assigned its rights against Lexington to PQ in exchange for PQ's promise not to collect on any judgment from Double D. PQ then replaced Double D as plaintiff in the federal action. PQ later filed a Second Amended Complaint adding a claim for attorney fees and costs under Section 155 of the Illinois Insurance Code, 215 Ill. Comp. Stat. 5/155.

PQ and Lexington eventually filed cross-motions for summary judgment. At summary judgment, PQ did not argue that Double D complied with the literal terms of the documentation condition appearing in the Insuring Agreement and Property Not Covered section. Nor could it: the parties agree that Double D did not use warehouse receipts or contracts in its dealings with PQ, nor did it supply PQ with rate quotations that would satisfy the policies. PQ argued instead that Lexington knew Double D used bills of lading and an online tracking system as a substitute for warehouse receipts. PQ argued that the term "warehouse receipt" is ambiguous and that the district court should consider extrinsic evidence tending to show that Lexington was aware of how Double D ran its business.

The district court disagreed, explaining that (1) bills of lading are not warehouse receipts, (2) PQ never signed any "receipt" generated by the online tracking system, and (3) Lexington's knowledge of Double D's business practices was "irrelevant to whether Double D in fact satisfied its contractual obligations—Double D either met those obligations or it did not (and in this case it did not)." *PQ Corp. v. Lexington Ins. Co.*, No. 13 CV 3482, 2016 WL 4063149, at *5–6 (N.D. Ill. July 29,

2016). The district court then considered whether Lexington waived strict enforcement of the documentation condition. The court rejected that possibility as well, finding no evidence that Lexington acted inconsistently with an intent to enforce the condition. *Id.* at *7. The court could have ended its analysis there. However, it went on to hold in the alternative that Double D had violated its duty under the Loss Adjustment section to obtain consent from Lexington before admitting liability to PQ. *Id.* at *9. The court also rejected PQ's claim under Section 155 of the Illinois Insurance Code. *Id.* The district court entered final judgment in Lexington's favor.[1]

II.  *Analysis*

   A.  *Standard and Scope of Review*

We review *de novo* the district court's grant of summary judgment to Lexington. In doing so, we apply the same standard that the district court applied, construing all facts and drawing all reasonable inferences in favor of PQ. *Indianapolis Airport Authority v. Travelers Property Casualty Co.*, 849 F.3d 355, 361 (7th Cir. 2017).

The parties agree that Illinois substantive law applies. In Illinois, "the general rules governing the interpretation of … contracts also govern the interpretation of insurance policies. 'If the policy language is unambiguous, the policy will be applied as written, unless it contravenes public policy.'" *Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir.

---

[1] Though the district court ruled generally in Lexington's favor, it rejected Lexington's reliance on the Pollution and Contamination Exclusion. *PQ Corp.*, 2016 WL 4063149, at *5. Because we agree with the district court that the documentation condition bars PQ's claim, we do not decide whether the pollution exclusion might also apply.

2015), quoting *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005). "Courts will not strain to find ambiguity in an insurance policy where none exists." *McKinney v. Allstate Ins. Co.*, 722 N.E.2d 1125, 1127 (Ill. 1999). "Although policy terms that limit an insurer's liability will be liberally construed in favor of coverage, this rule of construction only comes into play when the policy is ambiguous." *Hobbs*, 823 N.E.2d at 564.

B. *Duty to Obtain Consent*

The central dispute in this appeal concerns the meaning of the documentation condition to coverage in the Insuring Agreement and Property Not Covered sections. Before we analyze that condition, we briefly address Lexington's argument, which the district court also agreed with, that Double D breached the policy by settling with PQ without obtaining Lexington's consent.

Under Loss Adjustment section X.1.F, Double D agreed that it would "not, except at [its] own cost, voluntarily make a payment, assume any obligation, admit any liability, or incur any expense, without [Lexington's] written consent." Double D admitted in the consent judgment that it was liable for all of the damages to PQ's products. There is no evidence that Double D obtained (or even sought) permission from Lexington before making that admission. That is not enough to decide the case, though, because Lexington is estopped from asserting the section X.1.F consent requirement to avoid PQ's claim. Lexington denied coverage before PQ sued Double D and before those parties settled with Double D's admission of liability.

Illinois law is clear on this point. In *Davis v. United Fire &
Casualty Co.*, 400 N.E.2d 984 (Ill. App. 1980), for example, the
court explained that where an insurance company informs an
insured that it will provide no coverage, the insured is "justi-
fied in concluding that further communication and notice
would be useless and the company will not be allowed to as-
sert, as a defense, any failure by the insured to give such fur-
ther notice." *Id.* at 987; see also *Owners Ins. Co. v. Seamless Gut-
ter Corp.*, 960 N.E.2d 1260, 1271 (Ill. App. 2011) ("[A]n insurer
should not be allowed to assert a blanket denial of coverage
and then assert the insured's failure to provide proof of loss,
since the law does not require the insured to perform what
appeared to be a useless act."), citing *Jones v. Universal Casu-
alty Co.*, 630 N.E.2d 94, 101 (Ill. App. 1994).

Lexington advised Double D that it would provide no cov-
erage under the policies: its denial letters were clear and une-
quivocal. In the January 2013 letter, Lexington's claims exam-
iner wrote: "Lexington has completed its investigation of PQ's
claim and regrettably must advise … that there is no coverage
for PQ's claim." In the April 2013 follow-up, the claims exam-
iner elaborated: "Inasmuch as Double D did not obtain a
warehouse receipt [or] signed storage agreement or present a
rate quotation, the Policies do not cover PQ's goods." The ex-
aminer added that "even if PQ's property were covered prop-
erty under the Policies (which it is not) PQ's claim is barred
by the Pollution and Contamination Exclusion." The denials
were clear. Most important, Lexington was not offering to de-
fend Double D under a reservation of rights.

To avoid this logic, Lexington and the district court point
out that the Lexington denial letters did not close the door to
further communication. They invited Double D to submit

"any other information" that it felt "may be applicable or relevant to this matter." Such a vague and open-ended invitation does not neutralize the effect of the explicit denials of coverage. An insurer could always change its mind about coverage, of course. That mere possibility could not have justified requiring Double D to clear its settlement with PQ in advance with the insurer that had (we assume only for purposes of deciding this issue) breached the contract by denying coverage. Having received the denial letters and no offer of a defense under a reservation of rights, Double D had no reason to believe that further communication with Lexington would serve any purpose.

In arguing that Double D breached its duty to obtain consent, Lexington cites *American Country Insurance Co. v. Bruhn*, 682 N.E.2d 366 (Ill. App. 1997), and *Malaker v. Cincinnati Insurance Co.*, No. 09 C 1140, 2011 WL 1337095 (N.D. Ill. Apr. 7, 2011). Both cases are readily distinguishable from this case, where coverage had been denied before Double D reached the settlement. In *Bruhn*, the insured concealed his involvement in a fatal automobile accident for fear of criminal liability. 682 N.E.2d at 367. It was only years later, after the insured was sued by the administrator of the decedent's estate, that the insured finally notified his insurer about the accident. *Id.* at 368. In a declaratory judgment action brought by the insurer, the Appellate Court of Illinois signaled that the insured likely breached his duties under the policy's notice and cooperation provisions, adding that "public policy considerations militate strongly against coverage" where the insured has concealed his criminal activity. *Id.* at 372–73. There was no concealment here. Double D alerted Lexington immediately after receiving PQ's notice of potential claim.

*Malaker* is likewise distinguishable. In that case, the insurer denied the insured's claim in a letter that directed the insured to notify it of any related lawsuit "so that we may review the wording of the suit for any possible coverage." 2011 WL 1337095, at *1. In this case, Lexington's denial letters simply disavowed coverage and made no mention of any defense in the event of litigation. Lexington's denials are much closer to the flat denial in *Davis* than the incomplete denial in *Malaker*.

After Lexington rejected the claim, Double D reasonably concluded that any further communication with Lexington would be fruitless. We agree with PQ that Lexington, having denied coverage, is estopped from asserting the Loss Adjustment section's consent requirement as a defense to PQ's claim. Having left its insured to its own devices to defend itself, Lexington could not have relied on the consent requirement as an alternative basis to support its denial decision.

Under Illinois law, a liability insurer that declines to defend its insured is generally estopped from asserting policy defenses to coverage (including plausible defenses based on later-acquired evidence) if it turns out that the denial was unwarranted by then-existing information. See *Title Industry Assurance Co. v. First American Title Ins. Co.*, 853 F.3d 876, 883 (7th Cir. 2017). The estoppel rule is strong medicine: it generally leaves the insurer on the hook to satisfy any judgment against its insured or to pay the cost of any reasonable settlement. See *Guillen ex rel. Guillen v. Potomac Ins. Co. of Illinois*, 751 N.E.2d 104, 114 (Ill. App. 2001), *aff'd as modified*, 785 N.E.2d 1 (Ill. 2003). Fortunately for Lexington, as we explain below, its denial decision was justified under a separate policy condition.

C.  *The Documentation Condition for Coverage*

Although we reject Lexington's reliance on Loss Adjustment section X.1.F, the undisputed facts show that Double D failed to comply with the documentation condition to coverage appearing in the Insuring Agreement and the Property Not Covered section. For this reason, PQ's claim as Double D's assignee must fail.

1.  *Policy Language*

Under the Insuring Agreement, Lexington agreed to pay for damage to third-party property in Double D's custody. However, this coverage extended only to property for which Double D issued a "warehouse receipt or storage agreement." Property Not Covered section II.4 clarified that Lexington would pay for damages to a Double D customer's property only if Double D produced one of three documents: (1) a "signed warehouse receipt" that Double D obtained "from the 'customer' at the time the 'customer' deposited [its] personal property;" (2) a "signed storage agreement" that Double D obtained "from the 'customer' covering the personal property;" or (3) a "rate quotation" that Double D presented "prior to receiving the personal property." The policies defined "rate quotation" as a "quotation by [Double D] that includes a 'loss' limitation that is acknowledged and accepted by the 'customer.'" The terms "warehouse receipt" and "storage agreement" were not specifically defined in the policies.

The parties agree that Double D neither obtained a signed storage agreement from PQ nor presented PQ with a rate quotation that included a loss limitation. The disputed issue is whether Double D memorialized its transactions with a document that would satisfy the warehouse receipt option under

the policies. See *Sherrod v. Esurance Ins. Services, Inc.*, 65 N.E.3d 471, 475 (Ill. App. 2016) ("The burden is on the insured to prove that its claim falls within the coverage of an insurance policy."), citing *Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 752 (Ill. 2009). Steve Olsen, Double D's owner, testified that his warehouse did not use receipts. Instead, the warehouse managed its inventory by scanning the bills of lading that truckers use when transporting goods. PQ argues that these bills of lading are functionally equivalent to warehouse receipts and that they satisfied the documentation condition.

But the policies did not say that bills of lading could be used as substitutes for warehouse receipts. Nor did the policies say that Double D could satisfy the documentation condition by producing whatever documents of title it found most convenient. The policies were specific. They listed three warehouse documents that would satisfy the condition: a receipt, a contract, or a rate quotation. This requirement was not obscured by jargon or buried in fine print. It appeared in plain English in the first two sections of the policies. The policies also defined "customer" with reference to the condition: a "customer" was a "person or entity" that deposited property for storage and "obtain[ed] a signed warehouse receipt or ha[d] a storage agreement in place" or received a rate quotation. Illinois courts maintain a "strong presumption against provisions that easily could have been included in [a] contract but were not. A court will not add another term about which an agreement is silent." *Klemp v. Hergott Group, Inc.*, 641 N.E.2d 957, 962 (Ill. App. 1994) (citation omitted); accord *West Bend Mutual Ins. Co. v. DJW-Ridgeway Building Consultants, Inc.*, 40 N.E.3d 194, 205–06 (Ill. App. 2015).

PQ argues that the undefined term "warehouse receipt" is ambiguous and that we should therefore apply a canon of construction such as *contra proferentem* (interpretation against the drafter) or the principle that ambiguous terms in insurance policies should be read to favor coverage. PQ's premise is flawed: the fact that "warehouse receipt" was undefined does not make the term ambiguous. (If the rule were otherwise, already long and complex insurance policies would become virtually unreadable. Insurers would resort to longer and longer glossaries to avoid charges of ambiguity and unpredictable results in litigation.) "Warehouse receipt" is not ambiguous. The term has a settled meaning in common use and in the industry, as does, for that matter, "bill of lading." These terms are neither interchangeable nor even roughly synonymous.[2]

We begin with common usage. *William Blair & Co. v. FI Liquidation Corp.*, 830 N.E.2d 760, 770 (Ill. App. 2005). A receipt is commonly understood as a document supplied by a vendor of goods or services to record a transaction. The vendor gives

---

[2] PQ argues on appeal that the policies were internally inconsistent in that the Insuring Agreement required a receipt issued *by* Double D whereas the Property Not Covered section required a signed receipt obtained *from* the customer. PQ did not raise its intrinsic ambiguity argument in the district court and so forfeited it. *Omega Healthcare Investors, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 858–59 (7th Cir. 2007); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 391 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). Even if the argument were properly before us, it is not persuasive. The two provisions can and should be read as complementary. As a warehouse operator, Double D was required to issue the receipt and then to obtain a signature—on the receipt it issued—from its customer. See *Herbert Shaffer Associates, Inc. v. First Bank of Oak Park*, 332 N.E.2d 703, 708 (Ill. App. 1975) ("Where possible, all provisions of [a] contract are to be construed harmoniously.").

the receipt to the customer to acknowledge transfer of goods or payment. A warehouse receipt protects the customer by confirming its ownership of the goods it has entrusted to the warehouse. See *Mercantile Trading Co. v. Roth*, 113 N.E.2d 194, 196–97 (Ill. App. 1953) (enforcing provision of Warehouse Receipts Act requiring a writing to prove that customer had transferred ownership to warehouseman; evidence of oral agreement not sufficient). A bill of lading, by contrast, is commonly understood as a document used by a carrier to identify goods in transit and the conditions of carriage. Both terms have been in use since the early days of commercial law. E.g., *Union Trust Co. v. Wilson*, 198 U.S. 530, 536 (1905) ("Apart from statute, a warehouse receipt simply imports that the goods are in the hands of a certain kind of bailee."); *Pollard v. Vinton*, 105 U.S. 7, 8 (1881) ("A bill of lading is an instrument well known in commercial transactions, and its character and effect have been defined by judicial decisions. In the hands of the holder it is evidence of ownership … of the property mentioned in it, and of the right to receive said property at the place of delivery."); see generally *Bluebonnet Warehouse Cooperative v. Bankers Trust Co.*, 89 F.3d 292, 294–95 (6th Cir. 1996) (reviewing history of warehouse receipts and relevant uniform laws).

The plain meanings of the terms "warehouse receipt" and "bill of lading" undermine PQ's argument that the terms are interchangeable, but if we harbored any doubt, we could consider contemporary trade usage. See *Bristow v. Drake Street Inc.*, 41 F.3d 345, 352 (7th Cir. 1994) (evidence of trade usage is "admissible to interpret a seemingly clear contract;" unlike a party's testimony concerning his idiosyncratic understanding of language, evidence of trade usage is "objectively verifiable").

The Uniform Commercial Code (UCC), as adopted in Illinois, defines "bill of lading" as a "document evidencing the receipt of *goods for shipment* issued by a person engaged in the business of transporting or forwarding goods." 810 Ill. Comp. Stat. 5/1-201(b)(6) (emphasis added). The UCC defines "warehouse receipt" as a "receipt issued by a person engaged in the business of *storing goods* for hire." 5/1-201(b)(42) (emphasis added). The UCC sheds light on the standard contents of a warehouse receipt, providing that a warehouse will be liable for damages caused by the omission of such details as the storage and handling rate and the signature of the warehouse or its agent. 5/7-202(b). The receipt may also include a limitation of the warehouse's liability. 5/7-204(b). None of this information is included on the sample bills of lading in the summary judgment record.[3]

PQ tries to find ambiguity where there is none by citing deposition excerpts showing that Lexington's underwriters disagreed about the precise contents of a warehouse receipt. Even if we took account of this extrinsic evidence—and there is no reason for us to do so because the policy language is not ambiguous—we would not accept PQ's argument. Whatever the underwriters may have thought about the contents of a

---

[3] It appears that Illinois law requires regulated warehouses that store personal property of others for compensation to issue either negotiable or non-negotiable warehouse receipts in conformity with the Uniform Commercial Code. See 240 Ill. Comp. Stat. 10/10 (requiring issuance of receipts) and 10/2 (defining "warehouse" and "receipt"). The parties have not discussed these statutes in their briefs, but the statutes provide further support for the view that the references in the Lexington policies to warehouse receipts were not ambiguous but instead described a type of document well known in the industry.

warehouse receipt, neither of them confused warehouse receipts with bills of lading. Underwriter Toby Petzel testified that a "bill of lading is used in the transportation of goods, not as a warehouse receipt." Underwriter Chad Zomek described a bill of lading as a "document that is provided to a trucker for when they assume responsibility for moving a load," adding that if Lexington had agreed that bills of lading were acceptable substitutes for warehouse receipts, it would have endorsed the policy accordingly. Steve Olsen, Double D's owner, also recognized the difference between these documents, testifying that a "warehouse receipt would come from the warehouse" whereas "[y]ou have to have a bill of lading if you are transporting goods."

PQ argues that strict enforcement of the policies' documentation condition—which PQ calls a "hyper-technical interpretation"—would amount to a commercially unreasonable requirement that an agent of PQ physically sign off on each storage transaction at the time the goods are delivered to Double D. PQ apparently used a third-party trucking service to transport its goods to the Double D warehouse. It would surely be impractical to expect an agent of PQ to go along for the ride just to satisfy Lexington.

But in framing its commercial reasonableness argument, PQ seems to have overlooked that the policies approved the use of any of three documents: a warehouse receipt, a storage agreement, or a rate quotation. Under section II.4, neither the storage agreement provision nor the rate quotation provision would have required the customer to be physically present at the time of delivery. Double D's Steve Olsen testified that he has used storage agreements with several customers, suggesting that such contracts are a commercially reasonable means

of memorializing warehouse transactions, or at least good enough for Double D. Even if the warehouse receipt provision did not comport with Double D's business practices, the insurance policies provided other options that Double D could have used.

In sum, then, neither the plain language of the policies, trade usage, nor evidence of the parties' subjective knowledge about warehouse receipts and bills of lading leads us to conclude that these terms are interchangeable for purposes of the Lexington policies. If Double D wanted coverage beyond the four corners of the policies, it could have requested an endorsement or found a different insurer. The district court correctly determined that Double D failed to comply with a condition of coverage.[4]

2.  *Estoppel and Waiver*

PQ argues that even if it failed to comply with the documentation condition in the Insuring Agreement and Property Not Covered section, we should nevertheless remand for trial on whether Lexington either waived or should be estopped from relying on the condition. PQ's estoppel argument is new on appeal, and "as we have long held, '[i]t is axiomatic that an issue not first presented to the district court may not be raised before the appellate court as a ground for reversal.'" *Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720

---

[4] PQ argued in the district court that Lexington was on notice that Double D used bills of lading in lieu of warehouse receipts. On appeal, PQ reframes this argument by suggesting that the parties amplified or modified the express terms of the policies through a course of dealing. This course-of-dealing argument is a variation on PQ's waiver theory, addressed below.

(7th Cir. 2008) (alteration in original), quoting *Christmas v. Sanders*, 759 F.2d 1284, 1291 (7th Cir. 1985). We do not consider the estoppel argument.

PQ also raises its waiver argument for the first time on appeal, but here there is a quirk: the district judge raised the issue of waiver himself and decided that Lexington had not waived its right to enforce the condition. Since the district court decided what PQ now presents as its waiver theory, we exercise our discretion to consider the argument. We agree with the district judge and reject it on the merits.

In the context of insurance contracts, waiver "arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right." *Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E.2d 269, 282 (Ill. 2004). Waiver can be either express or implied by conduct that is inconsistent with an intent to enforce the right. Where, as here, there is no express waiver, the "party claiming an implied waiver"—PQ—"has the burden of proving a clear, unequivocal, and decisive act of its opponent manifesting an intention to waive its rights." *In re Nitz*, 739 N.E.2d 93, 103 (Ill. App. 2000); see also *Ryder v. Bank of Hickory Hills*, 585 N.E.2d 46, 49 (Ill. 1991) ("Implied waiver of a legal right must be proved by a clear, unequivocal, and decisive act of the party who is alleged to have committed waiver."); *Pielet v. Hiffman*, 948 N.E.2d 87, 96 (Ill. App. 2011) (same).

PQ's waiver theory is based on Double D's 2008 application to Lexington for insurance. Item 27 of the application directed Double D to attach a "complete copy of the warehouse receipt used." Rather than doing so—since Double D did not use warehouse receipts—either a Double D employee or Dou-

ble D's insurance broker, Jeff Krzyaniak (the record is unclear), annotated the application with a handwritten phrase: "CONTRACT DELIVERIES BY BIL LADEN" [*sic*]. Krzyaniak testified that nobody from Lexington ever asked him to clarify what the phrase meant and that he never submitted any other supporting documentation. Double D owner Steve Olsen confirmed that Lexington never followed up with him on the application.

The application dates from 2008, while PQ's claim relates to the 2010 and 2011 policies. Lexington's underwriters, Toby Petzel and Chad Zomek, acknowledged that they relied on the existing file when quoting the subsequent renewals. Neither Petzel nor Zomek gave any indication that he was aware of the handwritten notation. In fact, Zomek testified that he was unaware Double D used bills of lading in lieu of warehouse receipts; that he "would not consider a bill of lading to be a warehouse receipt;" and that he could not recall whether he "read anything in the … application that indicated one way or another what was being used as a warehouse receipt." But Zomek did recall reading the 2008 application, and Petzel likewise said that he received the application from Krzyaniak. Perhaps the most likely inference is that the underwriters just overlooked the barely legible notation when reviewing the file to renew the policies. On appeal from summary judgment, though, we owe PQ the benefit of conflicts in the evidence and reasonable inferences in its favor. On this record, a rational jury could conclude that Lexington's underwriters were aware of the handwritten note.[5]

---

[5] PQ argues that the 2008 insurance policy "incorporated that application in its policy language," the implication being that the subsequent renewals likewise incorporated the application. That's not quite right. The

That assumption does not provide sufficient support for the waiver theory. PQ's best evidence of waiver is an ambiguous note on an expired insurance application. PQ has not demonstrated a "clear, unequivocal, and decisive act" by Lexington manifesting its intention to waive its rights under the policies. *Ryder*, 585 N.E.2d at 49. There is no evidence that anyone from Lexington ever told Olsen or Krzyaniak that bills of lading were acceptable substitutes for warehouse receipts. PQ itself acknowledges that Lexington never followed up on the obscure note.

PQ's waiver argument is weaker still because of another aspect of the 2008 application—the inclusion of "Page 2 of 4" of a document titled "STANDARD TERMS AND CONDITIONS FOR MERCHANDISE WAREHOUSEMEN," appended to the last page of the application. The provenance of the Terms and Conditions sheet is not entirely clear. Double D owner Steve Olsen said that he used the document for some customers but not for PQ. He did not know whether Krzyaniak submitted the sheet along with the 2008 application. He could not remember whether he gave the sheet to

---

2010 and 2011 policies included a preamble stating that Lexington granted coverage "in reliance upon the Declarations and application for this policy." (We assume the 2008 and 2009 policies had similar language, though these policies were not included in the summary judgment record.) The fact that Lexington acted in reliance on an insurance application, as most insurers presumably do, does not mean that the application became part of the policy such that it modified the policy's plain language. Cf. *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) ("'For a contract to incorporate all or part of another document by reference, the reference must show an intention to incorporate the document and make it part of the contract.' Illinois requires that incorporation be clear and specific.") (citations omitted).

Krzyaniak, and he did not recall seeing the sheet when he signed the application.

On appeal, PQ argues that the district court "incorrectly assumed, relied upon, and expanded facts not in evidence—namely that the [Terms and Conditions sheet] was provided to Lexington by either Double D or [Krzyaniak] as part of the 2008 Application." The argument is curious: PQ placed the 2008 application (along with the mysterious Terms and Conditions sheet) in the summary judgment record, and it asserted in its own Statement of Facts under Local Rule 56.1(a) that this was the application that Krzyaniak had submitted.[6] During Chad Zomek's deposition, PQ's counsel initially presented Zomek with a copy of the application that did not include the Terms and Conditions sheet. Zomek noted the missing page. He testified that the Terms and Conditions sheet had been part of the underwriting file, though he did not know when the sheet was submitted. Later in his deposition, Zomek reviewed the sheet and testified that it was the document Lexington used "to identify the presence of a warehousing contract and/or warehousing receipt." Toby Petzel also reviewed the document, described it as a "contract limiting [Double D's]

---

[6] In its reply brief, PQ writes that it introduced the Terms and Conditions sheet into the summary judgment record only "because, at Lexington's insistence, the [sheet] had been included with previous application exhibits used in depositions," and PQ wanted to "avoid any assertion by Lexington that PQ was altering the format of documents." We do not understand the argument. If PQ believed the 2008 application did *not* include the Terms and Conditions sheet, it should have introduced whatever it considered to be the genuine document. If Lexington then introduced an alternative version, there might simply have been a fact question to resolve in a trial.

liability," and noted that he pays "very close attention" to such documents when writing policies.

Again, this is an appeal from summary judgment, so we must draw reasonable inferences in PQ's favor. Even with the scales tipped that far, this record does not provide evidence that would let a rational jury conclude that Lexington knowingly and voluntarily waived its right to enforce the documentation condition to coverage. PQ cannot avoid the plain language of the policies by offering an ambiguous notation on an insurance application, particularly where the inference PQ urges us to draw from that notation (that Lexington knew Double D used "BIL LADEN" in lieu of warehouse receipts) conflicts with the inference Lexington apparently drew from the Terms and Conditions sheet (that Double D was using receipts or contracts, as the policies required). PQ's scintilla of evidence in support of its waiver theory is not enough to put the matter to a jury. See *Roger Whitmore's Automotive Services, Inc. v. Lake County*, 424 F.3d 659, 667 (7th Cir. 2005).

D.  *Concluding Matters*

Because the district court correctly granted summary judgment to Lexington, we must also reject PQ's request for attorney fees under Section 155 of the Illinois Insurance Code. Section 155 authorizes a fee award only where an insurer's conduct is "vexatious and unreasonable." It is neither vexatious nor unreasonable to litigate a "bona fide dispute concerning the scope and application of insurance coverage," let alone to deny coverage based on a position that prevails. See *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000).

At bottom, this case is a reminder that in the law of contracts, words matter. We understand PQ's argument that the available records show reliably how much of its property was damaged at the Double D warehouse. The purpose of the documentation requirement in the Lexington policies may well have been satisfied here. But Double D agreed to document its transactions with warehouse receipts, storage agreements, or rate quotations as a condition of liability insurance coverage. It did not do so. PQ, standing in Double D's shoes, cannot recover from Lexington where Double D failed to comply with an enforceable condition to coverage. The judgment of the district court is

AFFIRMED.