In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 20-2033

JOSHUA L. CHELI,

*Plaintiff-Appellant,*

*v.*

TAYLORVILLE COMMUNITY SCHOOL DISTRICT, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 19-cv-03085 — **Sue E. Myerscough**, *Judge.*

———————————

SUBMITTED DECEMBER 10, 2020[*] — DECIDED FEBRUARY 3, 2021

———————————

Before SYKES, *Chief Judge*, and FLAUM and KANNE, *Circuit Judges*.

FLAUM, *Circuit Judge*. Taylorville Community School District #3 (the "District") terminated plaintiff Joshua Cheli. A

———————————

[*] We granted the parties' joint motion to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the Court. Fed. R. App. P. 34(a)(2)(C).

collective bargaining agreement between the District and its
employees provided, among other things, that an "employee
may be … discharged for reasonable cause." Cheli sued the
District and others for violating his procedural due process
rights under the Fourteenth Amendment. The district court
dismissed his case because it found that he lacked a protected
property interest in his continued employment. We disagree.
The collective bargaining agreement established that Cheli
could not be terminated except "for reasonable cause," which
created a protected property interest for which he was enti-
tled to due process. We accordingly reverse the district court.

## I. Background

Cheli worked as a computer systems administrative assis-
tant for the District from 2014 until 2018. He reported to the
District's superintendent Gregg Fuerstenau, Director of Com-
puter Services Chris Kuntzman, and Board of Education of
Taylorville CUSD #3 (the "Board"), also defendants in this
case. On September 28, 2018, with about twenty-five minutes'
notice, Fuerstenau and Kuntzman ushered Cheli to a meeting.
At the meeting, which lasted only a few minutes, Fuerstenau
and Kuntzman terminated Cheli because a female student
had alleged that Cheli had sexually harassed her three weeks
prior. Cheli denied the allegations, but Fuerstenau and Kuntz-
man told him the decision was a foregone conclusion.

The Board memorialized Cheli's termination by entering
a resolution on October 9, 2018, which retroactively took ef-
fect on September 28. Cheli never received notice of the Octo-
ber 9 Board meeting at which the Board passed the resolution,
nor did Cheli receive written notice of the charges or the evi-

dence against him considered by the Board. Based on the resolution, the Board sent Cheli a notice of termination via certified mail stating that "[t]he basis or grounds for discharge include incompetence." That notice informed Cheli that he could request the written report submitted by Fuerstenau stating the reasons for his discharge. However, the District did not provide the report upon Cheli's request.

Central to this dispute is the collective bargaining agreement that governed Cheli's employment with the District. Taylorville's Educational Support Personnel, Cheli's bargaining unit, had entered into a collective bargaining agreement, the Master Agreement, with the District for the 2017–2018 and 2018–2019 school years. Article VII of the Master Agreement, titled "Discipline or Dismissal," provides in full:

> 8.1 An employee may be disciplined, suspended, and/or discharged for reasonable cause. Grounds for discharge and/or suspension shall include, but not be limited to, drunkenness or drinking or carrying intoxicating beverages on the job, possession or use of any controlled and/or illegal drug, dishonesty, insubordination, incompetency, or negligence in the performance of duties.
>
> 8.2 A conference with the employee shall be held prior to any suspension and/or discharge.
>
> 8.3 An employee shall have the right to a representative of his/her choice in any

> meeting which may result in suspension and/or discharge.

8.4     A written explanation for the suspension and/or discharge shall be given the employee so affected.

8.5     Upon initial employment with Taylorville Community Unit School District #3, non-certified employees will serve a one hundred twenty (120) day probationary period. During the period, the probationary non-certified employee will be an at-will employee. If the employee's work is deemed unsatisfactory by the Administration and the Board during this period, the Board, at its discretion, may terminate the employment.

Another document, the District's Policy Manual (the "Manual"), incorporated the Master Agreement and further elaborated on employee termination policies within the District. That Manual contains a provision titled "Employment At-Will," providing that:

> Unless otherwise specifically provided, District employment is at-will, meaning that employment may be terminated by the District or employee at any time for any reason, other than a reason prohibited by law, or no reason at all. Nothing in School Board policy is intended or should be construed as altering the employment at-will relationship.

> Exceptions to employment at-will may include employees who are employed annually, have an employment contract, or are otherwise granted a legitimate interest in continued employment. The Superintendent is authorized to make exceptions to employing non-licensed employees at-will but shall maintain a record of positions or employees who are not at-will.

Based on his view that the Master Agreement gave him a protected property interest in his employment, Cheli sued the defendants under 42 U.S.C. § 1983, claiming the defendants violated his right to procedural due process under the Fourteenth Amendment. His suit included two counts, alleging he had a protected property interest in his employment and defendants violated his procedural due process rights by terminating him without (1) a predeprivation and (2) a postdeprivation hearing. The defendants filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The district court granted defendants' motion, finding that the facts Cheli alleged were "insufficient to permit a reasonable inference that [Cheli] ha[d] a constitutionally protected property interest in his continued employment with [the District]."

## II. Discussion

"We review a district court's grant of a 12(b)(6) motion to dismiss de novo." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016). We also review a district court's interpretation of state law de novo. *McCammon v. Ind. Dep't of Fin. Insts.*, 973 F.2d 1348, 1350 (7th Cir. 1992) (citing *Salve Regina Coll. v.*

*Russell*, 499 U.S. 225, 231 (1991)). To survive a motion to dismiss, Cheli must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). We must "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [his] favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Relevant to this case, "[t]o demonstrate a procedural due process violation of a property right, the plaintiff must establish that there is '(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process.'" *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010) (quoting *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004)).

Cheli "cannot under Section 1983 complain of procedural due process violations unless the state has first deprived him … of such a constitutionally protected [property] interest." *See Lekas v. Briley*, 405 F.3d 602, 607 (7th Cir. 2005). Therefore, "the threshold question is whether a protected property interest actually exists." *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011). Cheli and the defendants agree that the only issue on appeal is whether the Master Agreement gave Cheli a protected property interest in his employment.

Property interests are not inherent in the Constitution; "[r]ather, they are created and their dimensions are defined

by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *see also Bishop v. Wood*, 426 U.S. 341, 344 (1976) ("[T]he sufficiency of the claim of entitlement must be decided by reference to state law."). We therefore determine whether Cheli had a protected property interest in his employment with reference to Illinois law, the law of the state where Cheli was employed. *See Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007).

"Under Illinois law, a person has a property interest in his job only where he has a legitimate expectation of continued employment based on a legitimate claim of entitlement." *Id.* Accordingly, "[t]o show a legitimate expectation of continued employment, a plaintiff must show a specific ordinance, state law, contract or understanding limiting the ability of the state or state entity to discharge him." *Id.* (quoting *Krecek v. Bd. of Police Comm'rs of La Grange Park*, 646 N.E.2d 1314, 1318–19 (Ill. App. Ct. 1995)). Illinois law presumes "an employment relationship without a fixed duration is terminable at will." *See Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 317–18 (Ill. 1987). However, that presumption "can be overcome by demonstrating that the parties contracted otherwise." *Id.* at 318. "Property interests in employment may be created by express or implied contracts …." *Farmer v. Lane*, 864 F.2d 473, 478 (7th Cir. 1988).

Turning to the facts at hand, Cheli points to the Master Agreement as the contract establishing that he had a legitimate expectation of continued employment. Generally, to show a protected property interest in the employment context, "the terms of employment must provide that termination will only be 'for cause' or 'otherwise evince mutually explicit

understandings of continued employment.'" *See Cromwell v. City of Momence*, 713 F.3d 361, 364 (7th Cir. 2013) (quoting *Omosegbon v. Wells*, 335 F.3d 668, 674 (7th Cir. 2003)). A collective bargaining agreement with such a provision could create a property interest for due process purposes. *See, e.g., Brock v. Roadway Express, Inc.*, 481 U.S. 252, 260–61 (1987) (noting that the Secretary of Labor conceded that a collective bargaining agreement requiring termination only for cause could "constitute[] a property interest protected by the Fifth Amendment"); *Roman v. U.S. Postal Serv.*, 821 F.2d 382, 386 (7th Cir. 1987) ("This property interest is created by the collective bargaining agreement between the Postal Service and the Union, which provides that no employee shall be disciplined or discharged 'without just cause.'").

Therefore, the essential question on appeal is whether the Master Agreement provided the District could only terminate Cheli for cause. We interpret the plain language of the Master Agreement to answer that question. *See, e.g., Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1346 (7th Cir. 1995) (construing plain language of employment contract to determine whether it created job security); *Hohmeier v. Leyden Cmty. High Schs. Dist. 212*, 954 F.2d 461, 464 (7th Cir. 1992) (assessing manual under *Duldulao* framework to determine whether a personnel manual created a contractual right that overcame Illinois's at-will-employment presumption). We proceed, then, by addressing Sections 8.1, 8.5, and 8.2–8.4 of the Master Agreement in turn.

### A.  Section 8.1

Section 8.1 of Article VII of the Master Agreement provides "[a]n employee may be disciplined, suspended, and/or discharged for reasonable cause." The parties appear to agree that the "reasonable cause" language is similar to "just cause"

or "for cause" language that courts regularly hold to create an expectation of continued employment for due process purposes. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) ("The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'"); *Cain v. Larson*, 879 F.2d 1424, 1426 (7th Cir. 1989) ("In order to give rise to a constitutionally protected property interest, a statute or ordinance must go beyond mere procedural guarantees to provide some substantive criteria limiting the state's discretion—as can be found, for example, in a requirement that employees be fired only 'for cause.'"); *see also Roman*, 821 F.2d at 386 ("This property interest is created by the collective bargaining agreement …, which provides that no employee shall be disciplined or discharged 'without just cause.'"). We must therefore determine whether Section 8.1's specific language ("may be … discharged for reasonable cause") allows defendants to terminate Cheli only for "reasonable cause." If that language is mandatory, then the agreement overcomes the at-will presumption under Illinois law and establishes a protectable property interest. Cheli argues that the language is mandatory such that defendants may only terminate employees "for reasonable cause." Defendants, by contrast, argue the language is permissive because while they *may* terminate "for reasonable cause" they are not *required* to find "reasonable cause" prior to terminating an employee. They therefore contend that the district court correctly concluded that this "permissive language does not create a property interest in continued employment." We disagree.

We hold that the language of Section 8.1 mandates the only way defendants "may" terminate its employees who are party to the agreement: with a showing of "reasonable cause."

Section 8.1 imposes a requirement that defendants find "reasonable cause" to terminate an employee like Cheli. Per Section 8.1, on the *condition* of a finding of reasonable cause, defendants have discretion whether to take disciplinary action. Inversely, they cannot terminate employees without satisfying that reasonable-cause condition, which is to say the "state's discretion is clearly limited such that the plaintiff cannot be denied the interest unless specific conditions are met." *Khan*, 630 F.3d at 527 (internal quotation marks omitted) (quoting *Brown v. City of Mich. City, Ind.*, 462 F.3d 720, 729 (7th Cir. 2006)); *see also* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 112 (2012) (analyzing the text "[t]he tenant *may* vacate the premises on 30 days' written notice" to mean that when the condition is satisfied, the tenant has permission to vacate). Therefore, Cheli had a reasonable expectation in his continued employment because Section 8.1 confined defendants' discretion to terminate him. Flowing from the limits placed on defendants' discretion, then, Cheli enjoyed a protected property interest for the purposes of due process.

The remainder of Section 8.1 reinforces our view that this provision constrains defendants' otherwise wide latitude. Specifically, Section 8.1 lists what employee conduct might establish "reasonable cause" for dismissal: "drunkenness or drinking or carrying intoxicating beverages on the job, possession or use of any controlled and/or illegal drug, dishonesty, insubordination, incompetency, or negligence in the performance of duties." This list of grounds for discipline, as with the sentence preceding it requiring "reasonable cause," "establish[ed] a framework of factual conditions delimiting entitlements which are capable of being explored at a due process hearing." *Khan*, 630 F.3d at 527 (quoting *Fincher v. S. Bend*

*Heritage Found.*, 606 F.3d 331, 334 (7th Cir. 2010)). If defendants needed no reason at all to terminate employees, as is the case for at-will employees, this language would be mere "surplusage." *See Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (quoting *Coney v. Rockford Life Ins. Co.*, 214 N.E.2d 1, 3 (Ill. App. Ct. 1966)).

Our decision in *McCammon v. Indiana Department of Financial Institutions* further supports our conclusion regarding Section 8.1. In *McCammon*, we held that language comparable to Section 8.1 created a property interest. In that case analyzing Indiana law,[1] we interpreted a statute that provided that "[a]ny of the … employees … *may* be removed, at any time … for inefficiency, incompetency, or neglect of or failure to perform their duties." *McCammon*, 973 F.2d at 1350 (emphasis altered). We held the plaintiffs "had a protectible property interest in their employment," *id.* at 1353, even though the "may be removed" language (much like the "may be … discharged" language here) could be characterized as permissive. We agreed with the plaintiffs' contention that reading the statute as merely permissive "would do violence to the language of the provision, because [i]t would then be necessary to read the statute as '… may be removed … for inefficiency, incompetency, or neglect of or failure to perform their duties [*or for any other reason, or for no reason at all*].'" *Id.* at 1351

---

[1] While *McCammon* concerned Indiana law, Indiana and Illinois law share similarities with respect to the issues before us. Both states provide a rebuttable presumption of at-will employment. Moreover, both states rely on traditional canons of interpretation to interpret legal texts (statutes in *McCammon* and contracts in this case). As such, *McCammon* provides helpful guideposts for our analysis, even though it is neither binding on us nor was cited by the parties here.

(alteration in original) (internal quotation marks omitted). Here, defendants ask us to do that very violence to the Master Agreement and read "may be … discharged for reasonable cause" as instead saying "may be … discharged for reasonable cause [*or for any other reason, or no reason at all*.]" We decline to rewrite the Master Agreement. See *Thompson v. Gordon*, 948 N.E.2d 39, 51 (Ill. 2011) ("[A] court cannot alter, change or modify existing terms of a contract, or add new terms or conditions to which the parties do not appear to have assented.").

We disagree with the district court's conclusion that the language is permissive because adopting that reading would treat Section 8.1 as surplusage. Under Illinois law,

> [i]n construing contracts, to determine their intent, it is long established that a construction should be adopted, if possible, which ascribes meaning to every clause, phrase and word used; which requires nothing to be rejected as meaningless, or surplusage; which avoids the necessity of supplying any word or phrase that is not expressed; and which harmonizes all the various parts so that no provision is deemed conflicting with, or repugnant to, or neutralizing of any other.

*Curia*, 587 F.3d at 829 (quoting *Coney*, 214 N.E.2d at 3); *see also Thompson*, 948 N.E.2d at 47 ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used."). We therefore must interpret the Master Agreement—a contract—as establishing legal rights distinct from what would have existed in its absence, lest we render that contract meaningless. Defendants

would have us construe the Master Agreement to allow defendants to fire its employees without restriction, but the Master Agreement would not have been necessary to give defendants this authority. Illinois law would have presumptively found Cheli an at-will employee in the Master Agreement's absence. *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992) (explaining that employers "may discharge an employee-at-will for any reason or for no reason"). Alternatively, defendants suggest that Section 8.1 merely provides one way they may terminate employees, but as defendants acknowledge, "all employees in Illinois may be dismissed for cause." Clearly Section 8.1 does not purport to restate this truism but rather states that "reasonable cause" is the *only* way to dismiss these employees. Accordingly, Section 8.1 overrides the at-will-employment presumption in Illinois and raises the bar for what defendants must find before terminating its employees. In so doing, Section 8.1 vests its employees, like Cheli, with protected property interests.

Defendants' attempt to analogize this case to a trio of cases in which we held there was no protectable property interest does not alter our analysis. To defend their view that Section 8.1 only permitted, not required, them to terminate Cheli, defendants point to *Flaningam v. County of Winnebago*, 243 F. App'x 171 (7th Cir. 2007), *Border v. City of Crystal Lake*, 75 F.3d 270 (7th Cir. 1996), and *Lashbrook v. Oerkfitz*, 65 F.3d 1339 (7th Cir. 1995). In each of these cases, we concluded that the plaintiffs could not identify a "specific ordinance, state law, contract or understanding" that cabined the defendants' discretion. *Moss*, 473 F.3d at 700. The defendants here thus argue that Cheli's only "proof" of job security is language that we

have previously considered too permissive to support a protected property interest. However, they do so only after glossing over key factual distinctions in those cases.

In *Flaningam*, an unpublished opinion,[2] we interpreted a county code stating that "[i]n general, any action or attitude which adversely affects job performance or the reputation of the county government may be cause for disciplinary action." 243 F. App'x at 173. We held this language did "not limit the County's discretion or create an assurance of continued employment." *Id.* We noted that "permissive language" like that in the county code "generally does not create an enforceable property right." *Id.* at 174.

The Master Agreement is readily distinguishable for two reasons. First, it contains negligible permissive language. Unlike the multiple permissive terms ("in general," "any action or attitude," "affects job performance," and "reputation of the county") in *Flaningam*, the Master Agreement "limit[s] the [defendants'] discretion." *See id.* at 173. For the reasons explained above, the single "may" in Section 8.1 is not some talismanic word that automatically eviscerates Section 8.1's commands. Second, while the county code in *Flaningam* permitted discipline for "*any* action or attitude," Section 8.1 enumerates specific "[g]rounds for discharge" that evince a clear "limit [on] the [Board's] discretion." *Id.* at 173–74 (emphasis added).

---

[2] Circuit Rule 32.1(b) provides that "Orders, which are unsigned, are released in photocopied form, are not published in the Federal Reporter, and are not treated as precedents." Accordingly, *Flaningam* is merely persuasive authority, "and like any persuasive authority is entitled only to the weight that the force of its reasoning commands." *United States v. Papia*, 910 F.2d 1357, 1362 (7th Cir. 1990).

We turn next to *Border*. In *Border*, the plaintiff argued his employee handbook providing for termination and discipline "at any time, as may be appropriate, for conduct or performance" created a protectable interest. 75 F.3d at 272. We explained that under the Illinois Supreme Court's test in *Duldulao*, employee handbooks only "create[] enforceable contractual rights if the traditional requirements for contract formation are present." *See id.* at 273 (quoting *Duldulao*, 505 N.E.2d at 318). We then concluded that the handbook's language was too "weak" to qualify as an "employment contract offer," and the parties thus had not formed an implied contract for job security. *Id.* at 274. Consequently, Border could not rebut Illinois law's presumption of at-will employment because he failed to identify an entitlement under state law for due process purposes. *See id.* at 274.

Defendants' reliance on *Border* fares even worse. Unlike *Border*, Cheli does not have the threshold challenge of showing the Master Agreement is "enforceable either as an ordinance or as an implied contract" for job security with his employer. *Id.* at 274. Rather, the Master Agreement is an express employment contract with "just cause" language "that governed his employment relationship with [the defendants], and the instant case is distinguishable on that ground alone." *See Lashbrook*, 65 F.3d at 1346; *see also McWhorter v. Realty World-Star, Inc.*, 525 N.E.2d 1205, 1208 (Ill. App. Ct. 1988) (distinguishing between implied and express employment contracts).

Furthermore, as in *Flaningam*, the *Border* handbook's multiple permissive terms ("any time," "as may be appropriate," and "for conduct or performance") *preserved* the defendant's

discretion. *Id.* at 272. In contrast, Section 8.1's single invocation of the word "may" does not. Also, unlike the handbook, Section 8.1 contains the explicit phrase "reasonable cause"—a "hallmark of property" interests. *See Logan*, 455 U.S. at 430.

Of additional significance, neither the Master Agreement nor the Manual contains any language disclaiming a property interest. In *Border*, the presence of an explicit disclaimer that the employee handbook created a property interest "utterly dashed" any "incipient hope of a contractual promise." *Border*, 75 F.3d at 274; *see also Moss*, 473 F.3d at 700–01 (holding there was no "legitimate expectation of continued employment" because the policy manual at issue contained an "unambiguous disclaimer" of any property interest, even if the manual also stated that an employee "may be discharged for cause"). Here, the district court and defendants focus on the Manual's language that "[u]nless otherwise specifically provided, District employment is at-will," as evidence of a disclaimer. Far from an "unambiguous," *Moss*, 473 F.3d at 700, or "clear disclaimer," *Border*, 75 F.3d at 275, however, this language expressly *preserves* the possibility of a property interest "otherwise specifically provided." In fact, the Manual later spells out an exception to at-will employment for employees "granted a legitimate interest in continued employment," which is the precise issue now before us. That the Manual establishes at-will employment as the default is therefore irrelevant because Cheli enjoys a "legitimate interest in continued employment" under Section 8.1 of the Master Agreement.

Finally, we turn to *Lashbrook*. In *Lashbrook*, an employee argued first that an "automatic renewal" provision in his employment contract provided a protectable property interest. 65 F.3d at 1344. We concluded, however, that the contract did

not "create a reasonable expectation of continued employ-ment" because it elsewhere permitted Lashbrook or his em-ployer to terminate the contract. *Id.* at 1346. Therefore, Lash-brook had to point to some other promise of "a right to con-tinued employment, even at the end of the Contract's term." *Id.* Lashbrook asserted that his employee handbook (the per-sonnel policy manual ("PPM")) provided a promise of job se-curity. He argued the PPM "overr[o]de[] the plain terms" of his employment contract based on theories of contract modi-fication and parol evidence. *See id.* We concluded that the PPM was not an "enforceable modification," so it "failed to become part of the employment contract." *Id.* at 1346–47. We further explained in dicta that the PPM's language was too permissive under the *Duldulao* test in any event. We stated that Lashbrook "could not reasonably believe that the state-ment 'Department Heads, with the approval of the Director, may dismiss any employee for just cause' would mean that he could *only* be dismissed for just cause[,]" because the cited PPM language was "permissive, not mandatory." *Id.* at 1347 (emphasis added). We also rejected the notion that the PPM was admissible as parol evidence. *Id.*

The instant case is clearly distinct from *Lashbrook*. As a pre-liminary matter, while Lashbrook's employment contract al-lowed either Lashbrook or his employer to terminate with sixty days' notice, Section 8.1 by its plain terms allows termi-nation only with "just cause." *Id.* at 1346.

In addition, the plain terms of the employee manual in *Lashbrook* did not apply the "just cause" provision to Lash-brook. *See id.* at 1347 (reasoning the provision did not apply to Lashbrook because he "*was* the Director" and a "provision

allowing a lower level employee (a Department Head) to dismiss other employees with *Lashbrook's* approval could hardly provide additional rights to Lashbrook himself"). By contrast, the Master Agreement expressly covers "an employee," like Cheli, so it may "provide additional rights to [Cheli] himself." *See id. Lashbrook*, like *Border*, also involved a "prominent disclaimer" such that the PPM statements "could [not] have created a reasonable belief in Lashbrook that an offer of employment was being made." *Id.* Here, the "disclaimer" in the Manual to which defendants point, as explained above, rather than undermining any legitimate expectation of employment, expressly preserved the possibility of a property interest.

Overall, defendants effectively urge us to interpret the entire Master Agreement based on a single remark in *Lashbrook* that if the PPM had been an enforceable modification of Lashbrook's employment contract, it was too permissive anyways. We decline to do so. Viewed in the proper context, *Lashbrook* does not advance the defendants' case.

Finally, none of the above three cases featured a contract structure that reinforced a promise of job security. "[W]hen parties to the same contract use … different language to address parallel issues … it is reasonable to infer that they intend this language to mean different things." *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 690 (7th Cir. 2017) (some alterations in original) (quoting *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir. 1996)); *see also PQ Corp. v. Lexington Ins. Co.*, 860 F.3d 1026, 1033 (7th Cir. 2017) ("Illinois courts maintain a 'strong presumption against provisions that easily could have been included in [a] contract but were not. A court will not add another term about which an agreement is silent.'" (alteration in original) (quoting *Klemp v.*

*Hergott Grp., Inc.*, 641 N.E.2d 957, 962 (Ill. App. Ct. 1994))). Here, Section 8.5 of Article VII of the Master Agreement affirmatively provides the Board with the authority to terminate employees covered by Section 8.5's probationary period "at its discretion." A comparable term "easily could have been included in [Section 8.1] but [was] not." *See PQ Corp.*, 860 F.3d at 1033 (quoting *Klemp*, 641 N.E.2d at 962); *see also Mitchell v. Jewel Food Stores*, 568 N.E.2d 827, 835 (Ill. 1990) ("Defendant's own manual demonstrates that defendant knows how to specifically reserve to itself the discretion it feels it needs.… If defendant wants to reserve sole discretion to discharge any employee for any reason at any time, defendant could simply say so."). It is therefore "reasonable to infer" that the omission of a comparable term in Section 8.1 implies the authority to terminate employees under Section 8.1 is *not* at the Board's discretion. *See Right Field Rooftops*, 870 F.3d at 690.

In sum, we find defendants' reliance on the above cases unavailing because of critical factual differences between those cases and the one before us. Accordingly, we hold the Master Agreement between Cheli and his employer contains an express provision requiring the District terminate him only for cause. Moreover, as discussed below, the remainder of the Agreement's provisions further buttress our interpretation of Section 8.1 to allow defendants to fire Cheli only for cause.

## B. Section 8.5

The Master Agreement's reference to a probationary period reinforces our view that the Master Agreement creates a protectable property interest. "We have previously read contrasting employment-manual provisions regarding probationary and nonprobationary employees to create tenure

rights." *Cromwell*, 713 F.3d at 365. We do so when a probationary period is "coupled with other language independently suggesting an expectation of continued employment." *Id.* "The Illinois Supreme Court reached the same result … where an employment manual specifically reserved the employer's power to discharge probationary employees 'for any reason at the sole discretion of the employer,' but also specified that nonprobationary employees 'shall not be suspended, discharged or otherwise disciplined without just cause.'" *Id.* (citations omitted) (quoting *Mitchell*, 568 N.E.2d at 831, 835).

Section 8.5 provides for a 120-day probationary period during which a new employee "will be an at-will employee" and the "Board, at its discretion, may terminate the employment." If new employees are specifically classified as "at-will" employees here, then by implication employees serving more than 120 days are not. Otherwise, Section 8.5's language would be superfluous. Cheli worked longer than 120 days, at which point his property rights vested.

*Cromwell v. City of Momence*, cited by defendants, does not undermine this conclusion because we do not rely solely on Section 8.5's probationary period to hold that the Master Agreement vested Cheli with a protectable right. In *Cromwell*, an employee pointed to a probationary period for new employees to argue that he had a constitutionally protected interest. 713 F.3d at 364. The first relevant provision described a probationary period for new employees during which they could be fired for any reason. *Id.* The second provided that any officer who violated state or federal law, any city rules or regulations, or any order of the police chief may be disciplined, and set out the procedures by which discipline could be implemented. *Id.* We rejected Cromwell's argument that

"these two provisions" read together "imply that all *non* probationary officers have tenure and thus may be terminated only for cause." *Id.* Unlike *Cromwell*, the probationary period here is not the keystone of our holding. *See id.* (noting "[t]he mere presence of a probationary period does not by implication create an enforceable property right to continued employment for nonprobationary employees"). Far from "too much of a stretch," Section 8.5 of the Master Agreement, when "coupled with other language [in Section 8.1] independently suggesting an expectation of continued employment," gives rise to an "affirmative, clear promise" of a property interest. *Id.* at 364, 365.

Any other reading of Section 8.5 would undermine Article VII. The district court and defendants would have us read Section 8.1 as providing no restrictions on the District's ability to remove its employees (despite the "reasonable cause" language), yet simultaneously interpret Section 8.5's clear declaration that a subset of employees is "at will" as meaningless because, in its view, all employees are at-will. Only through linguistic gymnastics could we harmonize these two readings. The sensible reading is this: Under Section 8.5, new employees in their first 120 days of employment are at-will employees who the District may terminate for any reason. Under Section 8.1, employees who have worked longer than 120 days are no longer at-will employees and the District may terminate them only for "reasonable cause." Thus, Section 8.5 supports our holding that Cheli had a protected property interest.

## C. Sections 8.2–8.4

Finally, Sections 8.2–8.4 also bolster our view that the Master Agreement gives rise to a protected property interest. We

stated in *Border*: "Illinois courts have recognized that the *lack* of termination and grievance procedures weighs strongly against a finding of for cause employment. But this does not mean that the *presence* of such procedures indicates for cause employment, especially in the face of clear 'no employment contract' language." 75 F.3d at 275 (citation omitted) (citing *Ahlgren v. Blue Goose Supermarket, Inc.*, 639 N.E.2d 922, 927 (Ill. App. Ct. 1994)). However, "articulated procedures are a fundamental and necessary part of an employment contract which provides for an employee's discharge or dismissal only upon just cause." *Ahlgren*, 639 N.E.2d at 927. Therefore, the presence of such procedures, as in Sections 8.2–8.4, in conjunction with other provisions in the Master Agreement, can still support the existence of for-cause employment, especially in the absence of a "no employment" disclaimer. *See Border*, 75 F.3d at 275.

The Illinois Supreme Court addressed grievance procedures in *Griggsville-Perry Community Unit School District No. 4 v. Illinois Educational Labor Relations Board*, 984 N.E.2d 440 (Ill. 2013). In *Griggsville*, the court approved an arbitrator's interpretation of a collective bargaining agreement finding the employees were for-cause employees. *Id.* at 448. Notably, "a just-cause standard for dismissal was expressly discussed during negotiations over the collective-bargaining agreement but was not adopted," yet the arbitrator concluded that a provision outlining disciplinary procedures would be "rendered meaningless" if the plaintiffs were at-will employees. *Id.* at 446. The provision at issue required that the school district hold a meeting for any employee disciplined and provide "reasonable prior written notice of the reasons for such a meeting and shall be entitled to have a personal representative at said meeting." *Id.* at 444–45. The Illinois Supreme Court

held "the arbitrator's decision drew its essence from the collective-bargaining agreement." *Id.* at 448.

In this case, the Master Agreement contains specific provisions providing for disciplinary proceedings and requiring the defendants to provide a "written explanation" for their decisions. Sections 8.2–8.4 flesh out what the District must afford employees it disciplines and discharges: "[a] conference," "the right to a representative," and "[a] written explanation." While Sections 8.2–8.4 may not alone give Cheli a protected property interest, as with Section 8.5, they are compelling support for the existence of a property interest, especially considering that the Master Agreement and the Manual do not elsewhere include a "no employment contract" disclaimer that applies to Cheli. *See Border*, 75 F.3d at 275.

Consistent with the arbitrator and Illinois Supreme Court's decision in *Griggsville-Perry*, if Cheli were an at-will employee it would render Sections 8.2–8.4 "meaningless." *See id.* If all of defendants' employees are at will, then defendants would never need a reason to discharge them and thus never be required to provide its employees with the procedures laid out in the Master Agreement. This interpretation is belied by the fact that the Board applied those procedures to Cheli in practice, determining that Cheli was incompetent even though (according to its argument before this Court) such a finding was never necessary. Furthermore, the Master Agreement includes quintessential "just cause" language in Section 8.1 ("reasonable cause") in addition to the disciplinary procedures in Sections 8.2–8.4. The provisions here therefore create an even stronger expectation of job security than in *Griggsville-Perry* because the collective bargaining agreement

there did not contain "just cause" language and, in fact, the parties expressly rejected such language during negotiations.

Defendants seek to downplay the logical force of *Griggsville-Perry* because it concerned the "extremely limited" review of an arbitrator's decision, *id.* at 498, and because the Master Agreement here does not contain an arbitration provision. Be that as it may, the Illinois Supreme Court's view that the arbitrator did not simply adopt his "own brand of … justice," *id.* at 498, reassures us of the propriety of interpreting Sections 8.2–8.4 to support our finding of for-cause employment.

Having determined that the Master Agreement created a protected property interest in Cheli's employment, we leave to the district court to address the remaining elements of Cheli's procedural due process claim.

### III. Conclusion

If we accepted defendants' construction of the Master Agreement, then defendants could conceivably always circumvent its bargained-for strictures for the purposes of due process. If we accept that defendants need not find "reasonable cause" under Section 8.1, then the protections of Sections 8.2–8.4 would never attach because defendants would not have to explain or provide any process for terminating at-will employees. Conveniently by their reading, this would encompass all of their employees. To make any sense of the Master Agreement, we would need to go even further and read Section 8.5—declaring *some* employees as at-will employees—as somehow applying to *all* employees, nullifying the rest of Article VII. To prevent this illogical result, we REVERSE

the judgment of the district court and REMAND to the court for further proceedings consistent with this opinion.