In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2750

ROCK RIVER HEALTH CARE, LLC, *et al.*,

*Plaintiffs-Appellants*,

*v.*

THERESA A. EAGLESON,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-06532 — **John Robert Blakey**, *Judge*.

ARGUED OCTOBER 1, 2020 — DECIDED OCTOBER 4, 2021

Before EASTERBROOK, MANION, and ROVNER,
*Circuit Judges*.

ROVNER, *Circuit Judge*. Plaintiffs Rock River Health Care,
LLC, International Nursing & Rehab Center, LLC, and Island
City Rehabilitation Center, LLC, (collectively the "Provid-
ers") brought suit under 42 U.S.C. § 1983 and the Medicaid
Act, 42 U.S.C. § 1396a *et seq.*, alleging that the Illinois Depart-
ment of Healthcare and Family Services (the "Department")
violated constitutional and statutory law in retroactively

recalculating their Medicaid reimbursement rates for the three-month period of January through March 2016. The district court granted the Department's motion to dismiss the case. The Providers now appeal that decision only as to the dismissal of the procedural due process claim. Accordingly, we do not address the other claims raised in the district court.

The Providers in this case operate long-term nursing care facilities in Illinois, and receive per diem reimbursement for Medicaid beneficiaries from the Department, which administers the state's Medicaid program. Medicaid is a voluntary program that operates through a state and federal partnership, for the purpose of providing medical care for indigent, elderly, and disabled persons. States participating in Medicaid must administer their programs in compliance with the requirements of Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, known as the Medicaid Act. The Department provides per diem reimbursements to state-licensed care facilities for the care provided to Medicaid recipients, at a reimbursement rate calculated based on the type and amount of services furnished to each resident. 89 Ill. Admin. Code §140.530(a). The reimbursement consists of three components: (1) support cost; (2) nursing cost; and (3) capital cost.

This case concerns only the nursing component, which covers the wages and benefits for the nursing staff and social workers, payments for direct care consultants, and payment for health care supplies used by or for residents. As the district court noted, by the time that the state reimburses nursing facilities under the program, those facilities have already provided the services to the residents and generally have also already paid the nursing staff. The calculation of the proper rate

of reimbursement for nursing facilities is updated on a quarterly basis.

The reimbursement rate for nursing facilities is calculated using a model called the Resource Utilization Group reimbursement system, which is characterized as a "resident-based, facility-specific, cost-based" methodology. 305 ILCS § 5/5-5.2(d). Under that system, each facility submits Minimum Data Set assessments to the Department on a quarterly basis, which provide information as to the intensity of care and services for each resident in the facility. 305 ILCS §5/5-5.2; 89 Ill. Admin. Code §§ 147.310, 147.320. The Department uses that data to classify each resident and establish the facility's "case mix." *Id*. at §§ 147.325, 147.340. With that information, the Department calculates the nursing component of the reimbursement rate, which "shall be the product of the statewide RUG-IV [Resource Utilization Group] nursing base per diem rate, the facility average case mix index, and the regional wage adjustor." 305 ILCS §5/5-5.2(e-2).

At times, the Department conducts on-site reviews to verify the accuracy of those Minimum Data Set assessments. The contours for that review are set forth in detail in 89 Ill. Admin. Code § 147.340 (the "Code"). The Code provides that the Department "may select, at random" facilities in which to conduct quarterly on-site reviews, and also may select them based on a number of enumerated circumstances. *Id*. at § 147.340(b)–(d). Reviews can be conducted electronically or on-site at the facility. *Id*. at § 147.340(a). On-site reviews can include examination of "resident records and documentation, … observation and interviews of residents, families and/or staff" to determine the accuracy of the submitted data, and the "[r]eview and collection of information necessary to

assess the resident's need for a specific services or care area." *Id*. at § 147.340(g). Department staff are required to request in writing the current charts of individual residents that are needed to begin the review process. *Id*. at § 147.340(l). If further documentation is needed by the reviewers in order to validate an area, "the team shall identify the MDS [Minimum Data Set] item requiring additional documentation and provide the facility with the opportunity to produce that information" within 24 hours. *Id*. at § 147.340(m).

Finally, throughout that review, the Department is required to identify any preliminary conclusions regarding Minimum Data Set items or areas that could not be validated. *Id*. at § 147.340(o). If the facility disagrees with those preliminary conclusions, it can present the Department with any documentation to support its position. *Id*. As we will discuss later, although the Code provides for all of these procedures, the Providers argue that for each of their audits, the Department failed to identify items requiring further documentation and provide an opportunity to respond with such documentation, as is required under § 147.340(m), and failed to identify preliminary conclusions or areas that could not be validated, as is mandated by § 147.340(o).

Once the review is concluded, under the Code the Department provides the final determination to the facility, including its conclusions as to the accuracy of the data, and as to any reclassification of residents and recalculation of the reimbursement rates. *Id*. The facility can request reconsideration of any reclassification within 30 days. In that appeal, the facility can include explanations as to how the submitted data supported the classification of the resident and requires reconsideration, but cannot submit documentation that was not

provided to the Department during the initial review. *Id*. at
§ 147.340(u). The reconsideration is conducted by individuals
that were not directly involved in the initial review, and the
reconsideration decision is made within 120 days. *Id*. at
§ 147.340(v).

## I.

Following an audit by the Department, the reimbursement
rates for the plaintiffs were recalculated. According to the
Providers, the nursing component rates for the facilities were
retroactively decreased by 83%, 57%, and 20%. The Providers
sued the Department, alleging that the retroactive rate adjust-
ments violated federal Medicaid laws and both substantive
and procedural due process. The district court granted the de-
fendant's motion to dismiss, and the Providers appeal.

In an appeal from the grant of a motion to dismiss under
Federal Rule of Civil Procedure 12(b)(6), we review the claim
*de novo*, accepting all well-pleaded allegations as true and tak-
ing all reasonable inferences in the plaintiffs' favor. *Ashcroft v.
Iqbal*, 556 U.S. 662, 678 (2009). Only the procedural due pro-
cess claim is raised in this appeal. As to that claim, the Pro-
viders allege that the auditors did not follow certain proce-
dures mandated in the Code and that such failure was not an
isolated occurrence for one audit, but rather was the experi-
ence for the audits as to each of the Providers. Specifically, the
Providers claim that in the audits of each of them, the auditors
did not provide the preliminary results, and did not identify
allegedly missing or deficient documents or provide an op-
portunity to respond, as is required by Code sections
147.340(m) and (o). In addition, the Providers allege that the
procedure for reconsideration is inadequate to provide due

process because it prohibits the submission of any evidence not provided to the auditors at the initial stage.

In dismissing the claim, the district court held that the Providers lacked a property interest in their per diem Medicaid reimbursement rate and therefore did not merit due process protection. In so holding, both the court and the defendant on appeal characterize the Providers' claim as asserting a property interest in a particular per diem Medicaid reimbursement rate. Based on that characterization, the district court held that there was no legitimate claim of entitlement sufficient to constitute a property interest, because the Department "did not retroactively change a duly promulgated reimbursement rate for payments already made; instead, 'it retroactively changed a reimbursement rate contingent upon quarterly patient data that was subject to MDS audits and resulting adjustments per the terms of the Illinois state plan.'" Dist. Ct. Order at 10. In other words, the court held—and defendants argue here—that there was no threat to a property interest because the Department's actions were consistent with the law governing reimbursement rates, which allows for the auditing of the Providers and a recalculation of the rates. We turn, then, to an analysis of the procedural due process claim.

## II.

The Due Process Clause of the Fourteenth Amendment prohibits the deprivation of life, liberty or property by the government without due process of law. In analyzing a due process claim, we consider first whether the plaintiff has been deprived of a protected interest in property or liberty, and if that is established, we consider whether the state's procedures comport with due process. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).

As an initial matter, we note that the Providers argue in the complaint and the brief that the Department failed to comply with the procedures required by the Code. But the procedures required by state or local law do not define the constitutional requirements of notice and an opportunity to be heard—a point that we have made in countless cases for decades. See *Bradley v. Village of Univ. Park, Illinois*, 929 F.3d 875, 883 n. 3 (7th Cir. 2019) (noting that "[o]ur cases reiterating this principle are legion") and cases cited therein. A violation of state law will not create a constitutional claim, and compliance with state law will not shield a defendant from otherwise-unconstitutional conduct, "as Supreme Court precedent has 'establish[ed] the indifference of constitutional norms to the content of state law.'" *Id*. at 883 (quoting *Archie v. City of Racine*, 847 F.2d 1211, 1217 n.6 (7th Cir. 1988). Accordingly, the proper focus is whether the procedures provided by the Department for all of the audits of the Providers in this case met the minimal federal constitutional requirements of due process, not whether the requirements of the Illinois Administrative Code were met.

## A.

Property interests do not originate in the Constitution; "[r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *Cheli v. Taylorville Cmty. Sch. Dist.*, 986 F.3d 1035, 1039 (7th Cir. 2021). "Accordingly, federal property interests under the 14th amendment usually arise from rights created by state statutes, state or municipal regulations or

ordinances, and contracts with public entities." *Ulichny v. Merton Cmty. Sch. Dist.*, 249 F.3d 686, 700 (7th Cir. 2001). Even absent explicit contractual or statutory provisions evidencing such an entitlement, a property interest can be anchored in mutually explicit rules or understandings that support a person's claim of entitlement to the benefit, as the Court recognized with respect to the *de facto* tenure program in *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); see also *Forgue v. City of Chicago*, 873 F.3d 962, 970 (7th Cir. 2017). A protected property interest exists where substantive criteria clearly limit discretion "such that the plaintiff cannot be denied the interest unless specific conditions are met." *Bell v. City of Country Club Hills*, 841 F.3d 713, 719 (7th Cir. 2016) (internal quotation marks omitted); *Cheli*, 986 F.3d at 1042. A classic example of substantive standards cabining discretion is the requirement that an employee only be fired for cause, which courts have consistently recognized as establishing a property interest in employment. Where such law or mutually explicit rule gives people "a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement." *Kvapil v. Chippewa Cty., Wis.*, 752 F.3d 708, 713 (7th Cir. 2014) (internal quotation marks omitted).

Contrary to the Department's characterization, the claim here is not that the plaintiffs are entitled to a *particular* reimbursement rate, but rather that they are entitled to payment at the legally prescribed rate. The method of calculating the appropriate reimbursement rate is strictly circumscribed by the state law and administrative code. The Providers do not have a legitimate claim of entitlement to whatever rate they believe is appropriate, but they do have a legitimate claim of entitlement to reimbursement at the rate as established under

the law. See *Am. Society of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 455 (7th Cir. 2002) (in the Medicare context, stating that "[w]e agree with petitioners' assertion to the extent that they claim that they have a property interest in being reimbursed at the duly promulgated reimbursement rate as set out in the fee schedule"). The Providers seek due process to ensure a fair opportunity to establish that the data supported the rates as originally set. Because that payment is defined by statute, and is not a discretionary determination, it is the type of entitlement that triggers due process protection.

Even the defendant at oral arguments agreed that the Providers possess a legitimate entitlement to be paid for services rendered. The Department argues, however, that "any property interest they had was defined by the relevant regulations, which make reimbursement rates for nursing care contingent upon verification of the MDS data that the Department used to set the facility's reimbursement rate during the MDS onsite review process," and the district court employed similar reasoning. Appellee's Brief at 13.

That characterization of an entitlement as a contingent interest does not defeat the claim of a property interest here. "'An interest that gives rise to an entitlement is always a conditional interest,'" because if the plaintiff possessed an absolute right there would be no need for a hearing as there would be no issue to resolve. *Davis v. Ball Mem'l Hosp. Ass'n*, 640 F.2d 30, 40–41 (7th Cir. 1980), quoting *Geneva Towers Tenants Org. v. Federated Mortgage Investors*, 504 F.2d 483, 494 (9th Cir. 1974) (J. Hufstedler dissenting). "'[A] component in addition to the existence of an enforceable right' is necessary for there to be an entitlement, namely, that the interests be conditioned

'upon the existence of one or more controvertible and contro-
verted facts.'" *Davis*, 640 F.2d at 41, quoting *Geneva Towers*,
504 F.2d at 495 (J. Hufstdetler, dissenting); see also *Fincher v.
S. Bend Heritage Found.*, 606 F.3d 331, 335 (7th Cir. 2010) (not-
ing that "this circuit has consistently followed the reasoning
of Judge Hufstedler's dissent in *Geneva Towers*"). Therefore,
the availability of a procedure under which a plaintiff can be
deprived of the original reimbursement rate does not defeat
the claim of a property interest.

An analogy to our employment cases illustrates this point.
It is beyond dispute that employees who can be terminated
only for cause have a property interest in their jobs. But em-
ployers routinely engage in audits of finances and examine
attendance records to ensure there is no employee miscon-
duct. The existence of those procedures to uncover miscon-
duct, which can then constitute cause for discharge, does not
negate the property interest in continued employment. The
property interest is contingent by its nature; it requires a hear-
ing precisely because there are non-discretionary, objective
factors that can result in the forfeiture of that protected inter-
est. The existence of procedures that would assess the entitle-
ment to that interest is not a basis to deny the existence of the
property interest; it is a basis to require that the procedures be
conducted with certain due process protections.

That is because property interests rest upon a legitimate
*claim* of entitlement. *Bradley*, 929 F.3d at 895. The defendant's
belief that the plaintiff cannot succeed on that claim does not
eliminate the need to provide due process. Thus, in *Breuder v.
Bd. of Trustees of Community Coll. Dist. No. 502*, 888 F.3d 266,
270 (7th Cir. 2018), we rejected the college board's argument
that the president had no right to a hearing because the

president's contract extended beyond the terms of some board members and therefore was invalid under Illinois law. We held that Breuder's written contract for a term of years gave him a legitimate claim of entitlement to have the Board honor its promise, and the prospect that his claim could ultimately fail did not eliminate the claim's existence. *Id*. We further explained that critical distinction:

> Imagine the Board saying: "You have committed misconduct; therefore your tenure has ended; since you no longer have tenure, we need not offer you a hearing at which we have to demonstrate that misconduct occurred." The Supreme Court clearly established in *Roth* and its many successors that this maneuver won't work. A hearing is required to establish whether misconduct occurred. Just so here. The Board believes that Breuder's contract was invalid, making him an at-will employee … or that the contract could be cancelled for misconduct. But *whether* the contract was valid was subject to legitimate debate, and a hearing would have allowed Breuder to articulate his position and insist that the contract be enforced. Both the duration of Breuder's tenure and the existence of misconduct … were debatable subjects. The members who refused even to listen to him violated his clearly established rights.

*Id*.; *Bradley*, 929 F.3d at 895. Similarly, the Court in *Goldberg v. Kelly*, 397 U.S. 254 (1970), recognized that welfare recipients possessed a property interest in welfare payments that was grounded in the statute which defined the eligibility for such

benefits. As the Court noted in *Roth*, "[t]he recipients [in *Goldberg*] had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so." *Roth*, 408 U.S. at 577. The same reasoning applies here. Whether the reimbursement rate was valid is subject to legitimate debate, and a hearing or other due process would allow the Providers to articulate their positions and ensure that the legally-proper reimbursement rate is applied.

Accordingly, the proper focus is on whether the statute grants an entitlement to the benefit if the terms are met, not whether the claim of eligibility will survive scrutiny. If the original Minimum Data Set assessments set forth by the Providers was proper, there would be no doubt that they would be entitled to the rate appropriate to that classification, just as an employee would be entitled to retain her job if she did not engage in behavior that would constitute "cause" for removal. The possibility that the classifications would be deemed invalid does not mean that the providers are not entitled to due process in determining that validity, just as the possibility that the employee will be found to have committed misconduct does not mean that the employee is not entitled to due process in that determination. The structure of the Code provides an entitlement to the rate based on the Minimum Data Set assessment submitted by the provider, and is not dependent upon any other approval for its implementation. In fact, audits are not automatically undertaken as to a provider's rate calculation, and even if the Department audits a provider and determines that the data does not validate the rate, the Code does not provide for a recalculation of that rate unless the discrepancy would decrease the rate by more than one percent. See 89 Ill. Admin. Code § 147.340(t). If the

recalculation decreases the rate by more than ten percent, a penalty is imposed that decreases the rate by $1 for every percentage decrease in excess of two percent. *Id*. That penalty provision further makes clear that the audit procedures are a means of enforcement to ensure compliance, not an intrinsic part of the rate calculation, just as an employer's time cards and financial audits are used to identify employee misconduct that could provide cause for discharge. Accordingly, the Providers retain a legitimate entitlement to a rate determined according to that formula, and any action to alter the rate must be conducted with due process.

B.

With a property interest established, we consider the Providers' allegations that the procedures used in the reimbursement recalculation failed to provide due process. The Providers allege that the auditors failed to provide notice and an opportunity to be heard because the Department failed to follow procedures required in the Code, in that the Department did not request missing or insufficient documents prior to the end of the audit. As discussed, those allegations could constitute violations of the procedural protections of the Illinois Administrative Code (the "Code"), but the requirements of the Code and the Due Process Clause are not coterminous. A violation of the rights provided in the Code might provide a state law cause of action, but that is distinct from a constitutional violation. Therefore, those alleged Code violations relate to the constitutional claim only insofar as those protections would be required to provide a constitutionally-adequate notice and an opportunity to be heard. In addition, the Providers argue that the Code provisions themselves do not allow the production of additional documentation on appeal, and contend that

the denial of the opportunity to submit documentation prior to the conclusion of the audit and again on appeal create a high risk of erroneous deprivation of property.

The concept of due process is a flexible one which calls for such procedural protections as are necessary for a particular situation for the purpose of minimizing the risk of erroneous decisions. *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 12–13 (1979). The essential requirement of due process is notice and an opportunity to respond. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

> In *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the Court set forth three factors that normally determine whether an individual has received the "process" that the Constitution finds "due":
>
> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
>
> By weighing these concerns, courts can determine whether a State has met the "fundamental requirement of due process"—"the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"

*City of Los Angeles v. David*, 538 U.S. 715, 716–17 (2003) (quoting *Mathews*, 424 U.S. at 335).

The private interest affected by the official action here is the interest in receiving the full payment for the services provided, but it is a limited interest because the rates are determined on a quarterly basis and therefore the payments at issue are only for a three-month period of time. See *Mathews*, 424 U.S. at 341 (recognizing that an important factor in determining the impact of official action on the private interest is the possible length of the wrongful deprivation). That interest is not insignificant, and it also furthers the purpose of Medicaid to ensure that care and services are available to those in need. Nevertheless, Medicaid is comparable to Medicare, and in the Medicare context we have recognized that the provider is not the intended beneficiary of the Medicare program and that "a provider's financial need to be subsidized for the care of its Medicare patients is only 'incidental to the purpose and design of the (Medicare) program.'" *Northlake Cmty. Hosp. v. United States*, 654 F.2d 1234, 1242 (7th Cir. 1981) (quoting *Geriatrics, Inc. v. Harris*, 640 F.2d 262 (10th Cir. 1981)). Accordingly, although the Providers have a financial interest that can be adversely affected by the official action, its interest is a more narrow one because it is limited to a three-month period of time and because the Providers are only ancillary beneficiaries of the statutory program.

The risk of erroneous deprivation of that interest through the procedures used, and the probative value of additional procedural safeguards, weighs heavily against a finding that the procedures were sufficient here. At best, the procedures provided only a skeletal notice of the issues that would be considered by the auditors, because the auditors are given a

role in the Code that can involve the gathering of additional
evidence. An examination of the procedures reveals the po-
tential constitutional problem.

Once a determination has been made to audit a provider,
the facility is notified as to the residents' records that are sub-
ject to that review. Therefore, at the outset of the audit and
throughout the process, the facility is aware of the individuals
whose records are being reviewed and therefore called into
question. That constitutes a generalized "notice" to the pro-
vider as to the potential recalculation being considered and
the persons who are challenged. The provider is also aware of
the documentation that is required to support the rates.
Health care providers are required to submit their Minimum
Data Set information to the Department before the medical
services and goods are provided in order to establish the
quarterly rates. They are also required to maintain documen-
tation sufficient to support those determinations at all times,
and they can present that evidence to the auditors at the start
of the audit process. If the auditors were entrusted solely with
examining those records, and determining whether the docu-
mentation submitted by the Providers supported the reim-
bursement rates as a matter of law, then the procedures fol-
lowed in this case would have been constitutionally adequate;
those procedures would have provided to the Providers no-
tice of the patients for whom the evidence was questioned and
the legal standards that had to be met, an opportunity to pro-
vide any evidence supporting their claim, and an opportunity
to challenge on appeal the legal determination made by the
auditors. Because all evidence considered by the auditors
would come from the Providers themselves or the Providers'
own files, the Providers in such a situation would have notice
of the factual and legal issues presented. The failure to follow

additional procedures set forth in the Code would not impact that determination of the requirements of due process.

However, the auditors are not simply instructed to examine the evidence submitted and to assess whether the legal standards are met. Prior to making that ultimate assessment, the Code procedures empower the auditors to engage in the "[o]bservation and interviews of residents, families and/or staff, to determine the accuracy of data relevant to the determination of reimbursement rates, … and [r]eview and collection of information necessary to assess the resident's need for a specific service or care area." 89 Ill Admin Code § 147.340 (g)(2)–(3). Therefore, in addition to examining the evidence submitted by the Providers, the auditors are also empowered to gather evidence, and to base their decision on their own credibility assessments and factual findings from that evidence. That is problematic because the complaint alleged that the Department never informed the Providers of any inadequacies or deficiencies in the evidence that they had submitted, nor did the Department apprise the Providers of its opinion as to the sufficiency of the data presented. Although the Code in §§ 147.340(m) and (o) provides that auditors must notify the Providers of evidentiary deficiencies and initial conclusions, the Providers allege a systematic disregard of those protections by the Department for each of the Provider's audits.

The Providers, then, are not made aware of the evidence against them before the decision is made to recalculate the reimbursement rates. And at that point, the Providers have no further opportunity to present documents or other evidence. That omission is consequential because, in the absence of an opportunity to respond to new evidence gathered by the

auditors, the Providers would have no opportunity to address all of the facts upon which the recalculation is based. In that way, the procedures followed by the auditors gave the Providers an opportunity to present a *legal* challenge to the decision, but denied them any practical opportunity to mount a *factual* challenge to it. What is lacking in the procedures allegedly followed is a fundamental part of any due process inquiry, which is the opportunity to be presented with the evidence against the entity and an opportunity to respond.

Even in cases involving relatively-minimal property interests, courts have recognized that due process at a minimum requires an opportunity to ascertain and confront the evidence in opposition. For instance, in *Goss v. Lopez*, 419 U.S. 565, 576 (1975), the Court addressed the process constitutionally required for a student facing a 10-day suspension, which the Court characterized as a property interest entitled to some Due Process protection merely because it was "not *de minimi*s." Even for that time-limited and relatively minor deprivation, the Court held that due process required "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id*. at 581. The Court noted that "[t]he Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Id*.

Similarly, in *Gonzales v. United States*, 348 U.S. 407 (1955), the Supreme Court considered what is required for a selective service registrant claiming a conscientious objection exemption to be provided a "fair" and "just" process. In defining what can constitute a "fair" and "just" proceeding, the Court

held that "a prime requirement of any fair hearing" is that the decisionmaker cannot make use of evidence of which the party was never aware and had no chance to answer. *Id*. at 416. The Court concluded that "[j]ust as the right to a hearing means the right to a meaningful hearing, … so the right to file a statement with the Appeal Board includes the right to file a meaningful statement, one based on all the facts in the file and made with awareness of the recommendations and arguments to be countered." *Id*. at 415.

We have parroted that holding in numerous other cases, including ones involving property interests analogous to the one at issue here. For instance, in finding no due process violation in the decision to decertify facilities as Medicare or Medicaid providers, we held in *Americana Healthcare Corp. v. Schweiker*, 688 F.2d 1072, 1083 (7th Cir. 1982), that the procedures provided were adequate because the providers were given advance notice of the decision to decertify, and "each was informed of the deficiencies upon which the decision to decertify the facility was based and was afforded an opportunity for a resurvey to demonstrate any corrections made in the listed deficiencies and each was permitted to submit documentation explaining or refuting the existence of the deficiencies." We distinguished the procedures in *Americana Healthcare* from those found insufficient in *Hathaway v. Mathews*, 546 F.2d 227 (7th Cir. 1976), in that the Medicaid facility in *Hathaway* "did not receive notice of the alleged deficiencies, nor was a post-termination hearing available to it under the applicable regulations." *Americana Healthcare*, 688 F.2d at 1083. See also *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) (noting that "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights" and that the best instrument for arriving at truth is to provide notice of the case

against him and an opportunity to meet it) (internal quotation marks omitted); *Loudermill*, 470 U.S. at 546 (holding that the tenured public employee was "entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story"); *Mathews*, 424 U.S. at 345–46 (holding that a procedure based on written submissions was adequate because it included safeguards against mistake including that the agency informed the recipient of its tentative assessment and the evidence supporting it and an opportunity was then afforded the recipient to submit additional evidence "enabling him to challenge directly the accuracy of information in his file as well as the correctness of the agency's tentative conclusions").

That same distinction is present here. According to the amended complaint, the auditors failed to provide any notice of the alleged deficiencies prior to the final decision, and the Providers had no opportunity to submit additional documentation or other evidence following that decision. The burden on the Department in providing such notice is no impediment, given that the procedures are already in the Code. The Department need only follow those procedures rather than routinely bypass them. In the absence of that basic and fundamental protection against unfair or mistaken findings, the Providers have sufficiently alleged a violation of due process.

We need not address the Department's remaining argument, that the Eleventh Amendment limits the relief available to only prospective injunctive relief, given that the Providers seek prospective injunctive relief. The impact of the Eleventh Amendment on any other relief available is an issue for the

district court if the Providers succeed on the merits beyond this initial stage.

### III.

At this early stage in the litigation, the allegations are sufficient to allege a violation of procedural due process. Accordingly, the decision of the district court is REVERSED and the case REMANDED for further proceedings consistent with this opinion.